No. 53,483

THOMAS HALPIN, *Appellant,* v. PHILLIP FRANKENBERGER and TOPEKA BANK & TRUST, a corporation, *Appellees.*

(644 P.2d 452)

Opinion filed May 8, 1982.

*Frank M. Rice,* of Jones, Schroer, Rice, Bryan & Lykins, of Topeka, argued the cause, and *Dan L. Wulz,* of the same firm, was with him on the brief for appellant.

*L. M. Cornish,* of Glenn, Cornish, Schulteis & Hanson, Chartered, of Topeka, argued the cause and *Gregory F. Maher,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Plaintiff Thomas Halpin appeals from an order of the district court sustaining a motion for summary judgment filed by the defendant Topeka Bank & Trust, a Kansas banking corporation (the bank). The appeal involves the rights and duties existing between a guarantor and a creditor. Summary judgment was also granted to plaintiff against the other defendant Phillip Frankenberger and no appeal has been taken by Frankenberger from that ruling.

In 1975, Halpin and Frankenberger met and decided to go into the carpet business. They formed Centennial Carpet Sales, Inc., a Kansas corporation (Centennial), and each owned 500 shares of stock based upon a capital contribution of $5,000.00 each. Halpin was to be the administrative head of the venture and Frankenberger was to handle the sales end of the business. In order to operate, the corporation needed a line of credit and the two principals approached the defendant Topeka Bank & Trust to obtain it. The bank was agreeable but required security and personal guaranties from both Halpin and Frankenberger.

Halpin and his wife executed their guaranty to the bank on August 29, 1975, and a security agreement to the bank covering listed quality common stocks having a market value of nearly $200,000.00. Frankenberger and his wife executed their guaranty on September 9, 1975, and a security agreement on the cash value of certain life insurance policies in an amount of approximately $7,000.00, a 1976 Ford automobile, a 1970 Volkswagen automobile, and a second mortgage on their home in an amount of $16,000.00. The mortgage was duly filed with the Shawnee County Register of Deeds office. Centennial was also required to furnish a security agreement on its accounts receivable, inventory, equipment, etc.

The guaranty executed by the Halpins was in the following form:

"CONTINUING GUARANTY AGREEMENT—INDIVIDUAL
To Topeka State Bank and Trust Company
TOPEKA, KANSAS

"For value received, and in consideration of loans and/or advancements now made, or to be made hereafter by TOPEKA STATE BANK AND TRUST COMPANY, Topeka, Kansas, hereinafter referred to as Bank, to _____, hereinafter referred to as Debtor, and in consideration of such additional loans and/or advances as Bank may hereafter make to Debtor, the undersigned, _____, hereby agrees to pay and hereby guarantees payment to Bank of any and all obligations, including principal, interest and penalties, which Debtor now owes or may hereafter owe to Bank, including all renewals and/or extensions thereof.

"This promise to pay and guaranty is an open and continuing one, and includes all renewals and extensions of indebtedness now owed, or which may hereafter be owed by Debtor to Bank.

"Demand, protest, notice of nonpayment and notice of any extensions are hereby expressly waived, and the giving of notice of any making, renewal or extension of any note or indebtedness is also hereby expressly waived.

"This guarantee shall be binding on the undersigned and the heirs and assigns

of the undersigned without resort by Bank to Debtor or to any other party prior to the payment hereof by the undersigned.

"The undersigned reserves the right to terminate this guaranty as to future loans or advances, but such termination shall be effective only by written notice served upon an officer of Bank. In the event of such termination, this guaranty shall nevertheless remain in full force and effect and shall be binding upon the undersigned for all the loans and advancements, including interest, penalties and accumulations thereon, made prior to receipt of such written notification, and shall also remain binding for all renewals or extensions of any prior loans and advancements.

"Executed on this _____ day of _____, 19___."

The Frankenberger guaranty was in essentially the same form.

By the summer of 1977, the indebtedness of Centennial to the bank exceeded $200,000.00 and it became apparent to all concerned that the business could not survive. The corporation was insolvent and the two stockholders started liquidation of the business in July, 1977, and ceased doing business in August of the same year. On September 23, 1977, Centennial owed the bank $187,000.00 plus interest and on that date $164,000.00 was paid to the bank from the sale of a portion of Halpin's securities pledged as security with the bank. Frankenberger decided to leave town and requested the bank to release the second mortgage on his home so it could be sold. On November 29, 1977, the bank released the second mortgage and Frankenberger subsequently received about $29,000.00 for the equity in his home. Halpin was not advised of the request to release the mortgage and did not learn the mortgage had been released until sometime in the spring of 1978. In March, 1978, the balance of approximately $23,000.00 owed the bank was paid. Frankenberger never paid any amount to the bank or to Halpin for his share of the indebtedness.

After Halpin discovered that the bank had released the second mortgage and that Frankenberger had no intention of paying his share of the debt, Halpin filed suit against both Frankenberger and the bank. Plaintiff sought relief on three causes of action: (1) A judgment for contribution from Frankenberger for one-half of $138,169.20, the amount paid by Halpin, (2) a judgment setting over to plaintiff all of the security pledged by Frankenberger and deposited with the bank, and (3) judgment against the bank for the difference between the sales price of Frankenberger's house and the balance due on the first mortgage, which amount was approximately $29,000.00.

Following the filing of the petition, the bank, after seeking instructions from the court, turned over to the clerk of the court the Frankenberger insurance policies and the title to the Volkswagen automobile. That was the extent of the Frankenberger security still held by the bank. After discovery, plaintiff moved for summary judgment on all three claims. Defendant bank moved for summary judgment on the third claim. In sustaining plaintiff's motion on its first two claims, the court, in a memorandum opinion, stated:

"[I]t is the opinion of the Court that the Motion of the plaintiff for summary judgment should be sustained as to defendant Frankenberger and that plaintiff is entitled to judgment against the defendant Frankenberger in the sum of $69,084.60, together with the costs of this action.

"The judgment of the Court is that plaintiff is entitled to be equitably subrogated to all of the right, title and interest of the defendant bank and to be substituted as secured party for all securities held by the defendant bank at the time the plaintiff paid the obligations of Centennial in full."

Those rulings were not appealed from and the question of the judgment against Frankenberger and Halpin's right to contribution are not issues on appeal. Neither is the determination that Halpin was subrogated to all security still held by the bank.

On plaintiff's claim for damages against the bank for releasing the Frankenberger second mortgage and thereby impairing Halpin's right to subrogation, the court sustained the bank's motion for summary judgment on the theory that while plaintiff was subrogated to the bank's rights in the Frankenberger security, the right of subrogation did not arise until the bank had been paid in full. As there was still $23,000.00 owed the bank at the time it released the mortgage, plaintiff's rights of subrogation had not accrued and the bank had no duty at that time to preserve the security for the benefit of plaintiff.

Halpin has appealed from the latter ruling of the court granting summary judgment to the bank. No appeal has been taken by Frankenberger on the first two claims of the plaintiff. At the outset we are faced with the argument of the bank that plaintiff has acquiesced in the judgment of the trial court and therefore this appeal is barred. After the appeal had been perfected in this case, the plaintiff filed a motion in district court seeking to have the remaining Frankenberger security set over to him. The motion was granted and apparently plaintiff received from the clerk the insurance policies and car title. Appellee contends this pre-

cludes plaintiff from pursuing this appeal. We disagree. In *Brown v. Combined Ins. Co. of America,* 226 Kan. 223, 597 P.2d 1080 (1979), we set forth the rules on acquiescence in a judgment as follows:

"The general rule, subject to certain exceptions, is that a party to litigation who has acquiesced in the judgment of the trial court either by assuming the burden of such judgment or by accepting the benefits thereof will be deemed to have acquiesced in such judgment and may not thereafter adopt an inconsistent position and appeal from such judgment."

"Where a judgment or decree involves distinct and severable matters, demands or issues, an acceptance of the burdens or benefits of one or more parts thereof will not prevent an appeal as to the remaining contested matters, demands or issues."

"When a party to an appeal has paid or otherwise assumed the burden of any portion of a judgment rendered against such party, including the payment of costs, such party will not be deemed to have acquiesced in the judgment so long as the issues on appeal cannot affect the payments made or burdens assumed and such payment or burden is not involved in the issues on appeal. Likewise, any party to an appeal who accepts such payment shall not be deemed to have acquiesced in the judgment so long as the issues on appeal do not affect the obligation for the payment of or the rights to receive such portion of the judgment." 226 Kan. 223, Syl. ¶¶ 6, 7 and 8.

Here the property turned over to the plaintiff is not in dispute and has no bearing on this appeal. This appeal does not affect Halpin's right to that property and his acceptance of that portion of the trial court's judgment does not amount to acquiescence.

Appellant's basic contention is that the bank was under a statutory and/or common law duty to preserve or retain, for the benefit of Halpin, the Frankenberger security when the bank knew Centennial was insolvent and that Halpin had paid more than one-half of the indebtedness. Thus, Halpin contends that the bank, by releasing the Frankenberger second mortgage, impaired the security being held by the bank that would otherwise be available to satisfy Halpin's right to contribution. Initially, appellant contends that sections 84-3-606 and 84-9-207 of the Uniform Commercial Code apply.

K.S.A. 84-3-606(1)(*b*) provides in part:

"The holder discharges any party to the instrument to the extent that without such party's consent the holder . . . . unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

Halpin was not a party to the Frankenberger guaranty agreement and it was not an "instrument" as that term is defined in the

U.C.C. K.S.A. 84-3-102(*e*) defines "instrument" as a "negotiable instrument" and to be a negotiable instrument, a writing must comply with K.S.A. 84-3-104. The guaranty agreement does not comply with 84-3-104 in several respects and therefore 84-3-606 does not apply. *Kansas State Bank & Trust Co. v. DeLorean,* 7 Kan. App. 2d 246, 640 P.2d 343 (1982), *Farmers State Bank v. Cooper,* 227 Kan. 547, 552, 608 P.2d 929 (1980).

Halpin also contends that K.S.A. 84-9-207 applies in this action. That section states, in part:

"(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession.

. . . .

"(3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest."

In *Union Planters Nat. Bank of Memphis v. Markowitz,* 468 F. Supp 529 (W.D. Tenn. 1979), the court found the section inapplicable to a guarantor and said:

"[W]e do not believe that subsection (3) should be construed so broadly. The entire thrust of § 47-9-207 [K.S.A. 84-9-207] is to require a creditor to preserve collateral in his possession so as not to injure the person who has given that collateral. Thus, we read the phrase "any loss" in subsection (3) to mean any loss to the one who has provided the collateral." p. 535.

We are of the opinion that the trial court was correct in its holding that K.S.A 84-3-606 and 84-9-207 did not apply to the facts in this case.

The trial court, while holding that Halpin as a co-guarantor with Frankenberger was subrogated to the rights of the creditor bank as against the security pledged by Frankenberger, held that such a right of subrogation does not accrue until the debt has been paid in full. Halpin asserts that the bank was under a common law duty not to impair, or release, any of the Frankenberger security and to maintain it intact for the benefit of Halpin. While the right of Halpin to contribution from Frankenberger for one-half of the amount paid by Halpin is not disputed, the rights of Halpin against the bank and the bank's responsibilities to Halpin are not so clear. In *Blitz v. Metzger,* 119 Kan. 760, 241 Pac. 259 (1925), the court was faced with the question of whether a surety on a note was subrogated to the rights of the holder of the note as against security pledged by the maker of the note. The court stated:

> "A surety, on paying the debt of the principal, is entitled to be subrogated to the rights of the creditor in all or any of the securities, means or remedies which the creditor has for enforcing payment against his principal. . . . The creditor is entitled to full payment of his debt before subrogation can be invoked." p. 767.

While the terms "surety" and "guarantor" are not synonymous, they are often used interchangeably and the contract of a surety and that of a guarantor are similar in many respects. 38 Am. Jur. 2d, Guaranty §§ 14-16. In both situations the party sought to be charged is liable for the debt of another. In most instances a surety is liable on the original instrument along with the principal debtor, while a guarantor ordinarily enters into a separate contract with the creditor whereby he guarantees payment or performance by the debtor. The principles surrounding the right of a surety or a guarantor to be subrogated to the rights of the creditor, however, are similar.

Ordinarily the rights and obligations of a guarantor are established by the contract of guaranty. The same is true of the rights and obligations among co-guarantors. Absent agreement, it is clear that one co-guarantor has a common law right to contribution from his co-guarantors. It is also generally recognized that when a guarantor pays the principal's debt, the guarantor becomes subrogated to the rights of the creditor in seeking total reimbursement from the principal debtor, or contribution from his co-guarantor. Subrogation, as the term is defined, contemplates one person stepping into the shoes of another. As applied to a guarantor, it implies that the guarantor takes the place of, or inures to all of the rights of the creditor.

73 Am. Jur. 2d, Subrogation § 30 states:

> "The general rule is that a person is not entitled to be subrogated to the rights or securities of a creditor until the claim of the creditor against the debtor has been paid in full, although the entire debt need not necessarily be paid by the party seeking subrogation. This rule finds its principal application in the case of sureties. Formerly, the right of subrogation was limited to transactions between principals and sureties, and doubtlessly the rule grew out of the inequitable result which would otherwise necessarily follow in this class of transactions. Until the debt is paid in full, there can be no interference with the creditor's rights or securities that might, even by a bare possibility, prejudice or in any way embarrass him in the collection of the residue of his debt. Obviously, it would be unjust to permit a surety or other person on payment of part of a debt to appropriate to himself the security the creditor holds for the satisfaction of the entire indebtedness. If a surety who has made a partial payment should be subrogated pro tanto, he would occupy a position of equality with the holder of the unpaid part of the debt, and if the property were insufficient to pay the remainder of the debt for

which the surety is bound, the loss would fall proportionately on the creditor and the surety. One paying several installments due on a contract, but not all of them, is not entitled to subrogation, as where he makes part payment of a mortgage, or pays one or more of a series of notes. But the rule does not apply where the surety has paid one of a series of notes and is seeking merely to recover that payment from the principal debtor, not the apportionment or application for his benefit of securities in the hands of the creditor. Where a debtor pledges life insurance policies to secure several debts, a surety paying one of the debts is not entitled to any of the collateral securities until all the debts are discharged. When a creditor holds attachments against the debtor's property which secure several debts, a surety on one of the debts must, in order to be subrogated to the rights of the creditor in the attachments, pay all the debts the attachments secure. The creditor has the legal and equitable right to appropriate the attached property to the satisfaction of any of the claims secured by the attachments.

"Undoubtedly, the rule that payment in full of the indebtedness must be made before the right to subrogation exists may be changed or affected by statute. However, before a court would be warranted in construing a statutory provision as providing for a right of subrogation pro tanto, which differs from the right of subrogation recognized in equity, there should be some clear evidence in the statute of a legislative intention to make such change.

"The rule that the debt must be paid in full has in apparently every instance been invoked for the protection of the creditor, and never to defeat contract obligations in the interest of the debtor alone. Consequently, if the creditor consents to pro tanto subrogation, no one else is entitled to object. And even the creditor can object only to the extent that such subrogation would impair his preferred rights. The rule against allowing subrogation on the basis of part payment does not apply where the reason for it does not exist, as where there is no possibility that the creditor could be in any way prejudiced." pp. 617-619.

### In 73 Am. Jur. 2d, Subrogation § 54, we find:

"The requirement that the entire debt be paid before a right of subrogation arises is, of course, applicable where subrogation is sought by a surety." p. 632.

### The same authority at § 62 states:

"The fact that payment by one joint debtor ordinarily discharges the debt suggests a difficulty in the way of applying the doctrine of subrogation between co-obligors. But equity implies an exception to the foregoing rule of payment by keeping alive the debt for the benefit of the co-debtor who pays it. Until the debt is paid, and while the parties remain equally bound, there can, of course, be no subrogation." p. 637.

The guaranties executed by Halpin and Frankenberger were separate, in no way dependent upon each other insofar as the bank was concerned, continuing and open-ended so as to cover any existing indebtedness of Centennial or any future indebtedness. While it may be conceded that both guaranty and surety agreements were executed as a part of the same transaction, that

is, to secure a line of credit for Centennial, there is nothing in the agreements to indicate one is dependent upon the other. To the contrary, the guaranty agreements provide:

"This guarantee shall be binding upon the undersigned and the heirs and assigns of the undersigned *without resort by Bank to Debtor or to any other party* prior to the payment hereof by the undersigned." (Emphasis added.)

In addition, the guaranty agreements waived notice of default or of any extensions and in effect provided for liability by each guarantor regardless of the status of any other guarantor. Nothing in the guaranty agreements of Halpin and Frankenberger required the bank to retain all the security furnished by each guarantor until the entire debt was paid. Such a requirement could have been made a part of the contracts between the parties. We hold that on the facts in this case, the trial court did not commit error in determining that the bank could not be held liable in damages for releasing the second mortgage executed by Frankenberger. We have considered all points and arguments raised by appellant and find no error in the judgment of the trial court.

The judgment is affirmed.