**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

**v.**

**Jack GALLOWAY; Jack Galloway, d/b/a Jack's Excavating, a/k/a Jack's Excavating Co.; John W. Meyers, Jr.; Lorna M. Meyers; Harry D. Sharp; and Brenda C.M. Sharp, Defendants.**

Civ. A. No. 84–2106.

United States District Court, D. Kansas.

July 12, 1985.

Daniel B. Denk, McAnany, Van Cleave and Phillips, Kansas City, Kan., for plaintiff.

Ernest C. Ballweg, Cooke, Ballweg & Tuley, Leawood, Kan., for defendants Meyers & Sharp.

Joseph A. Bukaty, Kansas City, Kan., for defendants Galloway.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

Through this action, plaintiff seeks to recover from defendant Jack's Excavating Co. ("Company") and its president, defendant Jack Galloway ("Galloway"), on some seven promissory notes. As against defendants John W. and Lorna M. Meyers and Harry D. and Brenda C.M. Sharp ("the guarantor defendants"), the action is based on certain guaranty agreements related to those seven notes. Defendant Company essentially admits its liability, while defendant Galloway seeks to avoid liability on the ground that he signed the notes only in his representative capacity. Among the defenses raised by the guarantor defendants are the statute of limitations and fraud in the inducement.

The case was tried to the court on May 22 and 23, 1985. Upon reviewing the pleadings, the evidence received at trial, and the arguments and statements of counsel, the court makes the following:

### Findings of Fact

1. Plaintiff Federal Deposit Insurance Corporation ("FDIC") has been appointed by the Banking Commissioner of the State of Kansas as receiver of the former Mission State Bank & Trust Company ("the Bank").

2. On August 8, 1980, the District Court of Johnson County, Kansas, authorized FDIC (as receiver of the Bank) to sell to FDIC (in its corporate capacity) all assets of the Bank remaining after the sale or transfer of certain assets and liabilities to The Mission Bank, the Bank's successor.

3. Pursuant to that court order, certain assets, including the seven promissory notes and three guaranties at issue in this case, were sold or assigned to FDIC in its corporate capacity. Thus, any interest in those instruments once held by the Bank is now held by FDIC.

4. Defendant Jack Galloway is the president of defendant Jack's Excavating, a/k/a Jack's Excavating Co.

5. Defendants John W. Meyers, Jr., and Lorna M. Meyers are husband and wife. John W. Meyers was a stockholder and officer of Johnson County Equipment, Inc., which engaged in the purchase and resale of heavy equipment.

6. Defendants Harry D. Sharp and Brenda C.M. Sharp are husband and wife.

7. Defendants John W. Meyers and Harry D. Sharp each owned 25% of the stock in Kan-Tuck Coal Company, a Kentucky corporation.

8. Plaintiff's Exhibit 10 is a promissory note executed on November 30, 1977, with an initial maturity date of February 28, 1978. The principal amount financed through this note was $10,006.00, at an interest rate of 10 percent. The note was signed by "Jack Galloway," whose signature appears below the typewritten name

"Jacks Excavating." The note indicates, and the evidence received at trial confirms, that the note's payee ("The Mission State Bank & Trust Company") granted various extensions of the maturity date in return for partial payments by the maker(s). The last such extension expired on June 5, 1979.

9. Plaintiff's Exhibit 13 is a promissory note executed on October 25, 1977, with an initial maturity date of January 23, 1978. The principal amount financed through this note was $103,350.00, at an interest rate of 10 percent. The note was signed by "Jack Galloway," whose signature appears below the typewritten name "Jack's Excavating Co." The note indicates, and the evidence received at trial confirms, that the note's payee ("The Mission State Bank & Trust Company") granted various extension of the maturity date in return for partial payments by the maker(s). The last such extension expired on June 23, 1979.

10. Plaintiff's Exhibit 16 is a promissory note executed on March 21, 1979, with a maturity date of April 1, 1982. The principal amount financed through this note was $531,000.00, at an interest rate of 11.08 percent. Repayment was to be made in 36 monthly installments of $17,468.66, beginning on May 1, 1979, and continuing on the first day of each succeeding month until paid in full. The note was signed by "Jack Galloway." The name of no other maker appears on the face of the note. The note's payee ("The Mission State Bank & Trust Company") granted no extension of the note's maturity date.

11. Plaintiff's Exhibit 20 is a promissory note executed on March 14, 1979, with a maturity date of May 13, 1979. The principal amount financed through this note was $28,240.51, at an interest rate of 11 percent. The note was signed by "Jack Galloway." The name of no other maker appears on the face of the note. The note's payee ("The Mission State Bank & Trust Company") granted no extension of the note's maturity date.

12. Plaintiff's Exhibit 23 is a promissory note executed on February 10, 1979, with a maturity date of May 11, 1979. The

principal amount financed through this note was $54,000.00, at an interest rate of 10 percent. The note was signed by "Jack Galloway." The name of no other maker appears on the face of the note. The note's payee ("The Mission State Bank & Trust Company") granted no extension of the note's maturity date.

13. Plaintiff's Exhibit 26 is a promissory note executed on August 5, 1978, with an initial maturity date of October 4, 1978. The principal amount financed through this note was $112,000.00, at an interest rate of 10 percent. The note was signed by "Jack Galloway." The name of no other maker appears on the face of the note. The note indicates, and the evidence received at trial confirms, that the note's payee ("The Mission State Bank & Trust Company") granted various extensions of the maturity date in return for partial payments by the maker(s). The last such extension expired on June 5, 1979.

14. Plaintiff's Exhibit 29 is a promissory note executed on February 15, 1978, with an initial maturity date of April 16, 1978. The principal amount financed through this note was $52,003.00, at an interest rate of 10 percent. The note was signed by "Jack Galloway." The name of no other maker appears on the face of the note. The note indicates, and the evidence at trial confirms, that the note's payee ("The Mission State Bank & Trust Company") granted various extensions of the maturity date in return for partial payments by the maker(s). The last such extension expired on June 5, 1979.

15. In signing each of these seven notes, Galloway intended to act only as the representative of the Company. Neither he nor the Bank intended that he be personally liable on the notes.

16. Galloway had authority to sign these notes on behalf of the Company.

17. On May 14, 1981, FDIC realized proceeds of $170,755.25 from the sale of collateral that had secured these notes.

18. Demand has been made for the payment of the notes' remaining principal and accrued interest.

19. As of April 15, 1985, the remaining principal and interest due on these seven notes totalled $1,068,578.25. Since that date, interest has been accruing on the notes at the contractual rate of $209.79 per day.

20. Aside from its notarization, Plaintiff's Exhibit 32 reads, in full:

### LOAN GUARANTY AGREEMENT

<u>10–20</u> , 1977

The undersigned for and in consideration of the sum of One Dollar and other good and valuable considerations, to me in hand paid by THE MISSION STATE BANK & TRUST CO., Mission, Kansas (hereinafter called the "Bank") the receipt whereof is hereby acknowledged, does hereby absolutely and unconditionally guarantee to said Bank, its successor, successors or assigns, payment at maturity of any and all existing and future indebtedness and liability of every kind, nature and character of $ <u>63000.00</u> (Plus all legal interest charges made by said Bank) either made or endorsed by <u>Jack Galloway</u> (Hereinafter called the "Borrower") to the Bank, howsoever and whensoever created, or arising, or evidenced, or acquired; and the undersigned waives notice of the acceptance of this guaranty and any and all such indebtedness and liability. The undersigned hereby waives presentment, protest, notice, demand or action on delinquency in respect of any such indebtedness or liability, including any right to require the Bank to sue or otherwise enforce payment thereof.

This guaranty is made and shall continue as to any and all such indebtedness and liability of the borrower to the bank incurred or arising prior to receipt by the bank of written notice of the termination hereof from the undersigned.

This guaranty shall bind the heirs, personal representatives, succesors assigns of the undersigned and shall inure to the Bank, its successors and assigns.

/s/ <u>Jack W. Meyers</u>
Guarantor

21. With the following exceptions, plaintiff's Exhibit 33 is identical to Plaintiff's Exhibit 32:

(1) The date is "3–20–1979," rather than "10–20–1977";

(2) The amount is "$531,000.00," rather than "$63,000.00"; and

(3) The signatures are those of "Jack W. Meyers" *and* "Lorna M. Meyers," rather than merely "Jack W. Meyers."

22. Plaintiff's Exhibit 34 is identical to Plaintiff's Exhibit 33, except that the signatures appearing thereon are those of "Harry D. Sharp" and "Brenda C.M. Sharp," rather than "Jack W. Meyers" and "Lorna M. Meyers."

23. Defendant John W. Meyers signed Plaintiff's Exhibit 32 because Galloway had borrowed money from the Bank for the purpose of purchasing $63,000.00 worth of machinery from Johnson County Equipment, Inc. The guaranty was thus beneficial to defendant Meyers.

24. The guarantor defendants signed Plaintiff's Exhibits 33 and 34 because Galloway had borrowed $531,000.00 from the Bank so he could purchase equipment of that value from Kan-Tuck Coal Company. The sale of that equipment to Galloway allowed Kan-Tuck to repay its loan to the Bank. The guaranty was thus beneficial to the guarantor defendants.

25. Before signing Plaintiff's Exhibits 33 and 34, the guarantor defendants asked the Bank's president, Theodore Meyer, whether Galloway was a good credit risk. Among other assurances given these defendants by Mr. Meyer were that (1) Galloway had repaid in full the loan guaranteed by John W. Meyers in Plaintiff's Exhibit 32, and (2) the Bank would establish a $50,000.00 escrow account to help cover any monthly payments that Galloway might fail to make on the note introduced as Plaintiff's Exhibit 13.

In fact, Galloway had not repaid the earlier loan, and Theodore Meyer was aware of that fact. Nor did the Bank establish the promised $50,000.00 escrow account. At no time did Theodore Meyer even intend to establish such an account.

These misrepresentations were made with the intent to deceive the guarantor defendants by understating the risks involved in signing the guaranties. Because these risks were understated, the guarantor defendants did suffer an injury as a result of the misrepresentations. Given all the circumstances, including Theodore Meyer's status as president of the Bank, the guarantor defendants justifiably relied on his misrepresentations in deciding to sign Plaintiff's Exhibits 33 and 34. Were it not for these misrepresentations, they would not have signed.

As to all the facts contained within finding number 25, the evidence received at trial was clear and convincing.

26. On August 4, 1979, defendant John W. Meyers made a payment to the Bank of $17,468.66. This represented one month's payment on the note introduced as Plaintiff's Exhibit 16, and was paid pursuant to the 1979 loan guaranty agreement (Plaintiff's Exhibit 33).

27. This action was filed on March 9, 1984.

### Conclusions of Law

1. Pursuant to 12 U.S.C. § 1819 (Fourth), we have subject matter jurisdiction over this action. *See Freeling v. Sebring,* 296 F.2d 244 (10th Cir.1961).

2. The pre-trial order notes no objection either to personal jurisdiction or to venue. The parties have thus waived any such objection.

█ 3. Under the Kansas Uniform Commercial Code:

(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

K.S.A. 84-3-302(1).

4. The Code also provides, however, that:

(3) A holder does not become a holder in due course of an instrument:

(c) by purchasing it as part of a bulk transaction not in [the] regular course of business of the transferor.

K.S.A. 84-3-302(3)(c). This provision "has particular application to the purchase by one bank of a substantial part of the paper held by another bank which is threatened with insolvency and seeking to liquidate its assets." *Id.,* Official U.C.C. Comment 3, ¶ 2. Not surprisingly, then, the transfer of financial instruments to the FDIC under circumstances such as these is not "in the ordinary course of business." *Gunter v. Hutcheson,* 674 F.2d 862, 872 (11th Cir. 1982), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Thus, even assuming FDIC's receipt of these instruments satisfied the three requirements of K.S.A. 84-3-302(1), FDIC would still not be a holder in due course *under Kansas law.*

█ 5. The federal courts, however, have not confined the FDIC to reliance on applicable state holder in due course rules. Rather, they have enunciated as a matter of federal common law a holder in due course rule that abandons the "regular course of business" requirement. The Sixth Circuit, for example, has held that:

When the FDIC in its corporate capacity, as part of a purchase and assumption transaction, acquires a note in good faith, for value, and without actual knowledge of any defenses against the note, it takes the note free of all defenses that would not prevail against a holder in due course.

*F.D.I.C. v. Wood,* 758 F.2d 156, 161 (6th Cir.1985). In *Gunter,* the Eleventh Circuit enunciated a similar rule of federal common law. *See* 674 F.2d at 873.

6. As to the promissory notes at issue here (Plaintiff's Exhibits 10, 13, 16, 20, 23, 26, and 29), FDIC qualifies as a holder in due course under federal common law. The maker or makers of these notes are thus liable to FDIC for the total outstanding balance and accrued interest. The question is: who is/are the maker(s) of these notes?

**1398**

■ 7. Under the Kansas Uniform Commercial Code:

(1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority.

K.S.A. 84–3–403(1). Parol evidence is admissible for the purpose of establishing such authority. *Id.,* Official U.C.C. Comment 1, ¶ 2. In this case, we have found that defendant Galloway, whose signature appears on each of these notes, was authorized by defendant Company to sign the notes on the Company's behalf. The Company is thus liable to FDIC as a maker of the notes.

8. Defendant Galloway asserts that, because he signed the notes only in his representative capacity as president of defendant Company, he is not personally liable on the notes. This issue must be addressed under the following provisions of the Kansas Uniform Commercial Code:

(2) An authorized representative who signs his own name to an instrument

(a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity;

(b) except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity,

. . . .

K.S.A. 84–3–403(2).

■ Standing alone, an agent's signature "personally obligates the agent and parol evidence is inadmissible under subsection (2)(a) to disestablish his obligation." *Id.,* Official U.C.C. Comment 3, ¶ 3. As to the notes introduced as Plaintiff's Exhibits 16, 20, 23, 26, and 29, then, parol evidence may not be received for the purpose of relieving defendant Galloway of personal liability.

■ The rule as to the notes introduced as Plaintiff's Exhibits 10 and 13 is only slightly less restrictive. Because these two notes do "[name] the person represented but [do] not show that the representative signed in a representative capacity," K.S.A. 84–3–403(2)(b), parol evidence is admissible "in litigation *between the immediate parties* to prove signature by the agent in his representative capacity." *Id.,* Official U.C.C. Comment 3, ¶ 5 (emphasis added). The "immediate parties" to these notes do not include FDIC. Parol evidence as to defendant Galloway's intent in signing the notes is thus inadmissible as against FDIC. As with defendant Company, then, defendant Galloway is personally liable to FDIC on all seven of these notes.

9. Defendants Galloway and Company are jointly and severally liable for the full amount of FDIC's prayer against them in this case.

10. "The following actions shall be brought within five (5) years: (1) an action upon any agreement, contract or promise in writing." K.S.A. 60–511(1). However, "[i]n any case founded on contract, when any part of the principal or interest shall have been paid, ... an action may be brought in such case within the period prescribed for the same, after such payment." K.S.A. 60–520(a). *See Hustead v. Bendix Corp.,* 233 Kan. 870, 877, 666 P.2d 1175, 1180–81 (1983).

■ 11. This suit was filed more than five years after the original maturity dates on the notes introduced as Plaintiff's Exhibits 10, 13, 26, and 29. However, because defendant Galloway made partial payments on those notes, and because suit was filed less than five years after the notes' *extended* maturity dates, none of the notes is subject to a statute of limitations defense.

12. This is not to say, however, that K.S.A. 60–511(1) might not bar at least part of FDIC's suit against the *guarantors* of these notes. The parties have cited no Kansas authority directly on point. As a general rule, however:

the statute of limitations begins to run on the obligations of a guarantor when all of the conditions to the liability of the guarantor have occurred. Thus, in an absolute guaranty—where the only condition to the obligation of the guarantor is the default of the debtor—the statute of limitations begins to run against the creditor on the guaranty contract at the date when the debt or obligation is payable. In the case of a guaranty of a promissory note, the running of the statute commences at the time of maturity of the instrument; ....

It has generally been held that a payment by the principal debtor does not have the effect of tolling the statute of limitations as to the guarantor.

38 Am.Jur.2d *Guaranty* § 122 (1968). *See also* Annot., 84 A.L.R. 729 (1933) ("In most of the jurisdictions in which the point has arisen, it has been held that a payment by a principal debtor will not operate to toll the Statute of Limitations as to a guarantor of the debt.").

■ 13. The note introduced as Plaintiff's Exhibit 13 became "payable" on its original maturity date of January 23, 1978. Because that note financed a principal amount of $103,350.00, the statute of limitations as to the entire guaranty agreement introduced as Plaintiff's Exhibit 32 (in the amount of $63,000.00) began to run as of that date. Defendant Galloway's partial payments on the note did *not* toll the statute of limitations as to this guaranty agreement. Thus, K.S.A. 60–511(1)'s five-year statute of limitations bars FDIC's suit on the guaranty introduced as Plaintiff's Exhibit 32.

14. As to the other guaranty agreements (Plaintiff's Exhibits 33 and 34), the guarantor defendants rely on the defense of fraud in the inducement. Under Kansas law:

6. "Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the trust (sic), where

another party justifiably relies on the statement and acts to his injury."

7. "Fraud is never presumed and must be proven by clear and convincing evidence."

8. "The term 'clear and convincing evidence' means: The witnesses to a fact must be found to be credible, the facts to which the witnesses testify must be distinctly remembered; the details in connection with the contract must be narrated exactly and in order; the testimony must be clear, direct and weighty, and the witnesses must be lacking in confusion as to the facts at issue."

*Price v. Grimes*, 234 Kan. 898, 902–03, 677 P.2d 969, 973 (1984) (quoting *Nordstrom v. Miller*, 227 Kan. 59, Syl. ¶¶ 6–8, 605 P.2d 545 (1980)). Kansas law further provides that:

Although contractual fraud requires the false representation of a material existing fact, rather than a promise of something to be done in the future, an exception exists when the promissor has no intention of carrying out the promise at the time it is made. Under those circumstances the promissor's intent is the existing fact which is fraudulently misrepresented.

*Gonzalez v. Allstate Insurance Co.*, 217 Kan. 262, 265, 535 P.2d 919, 922 (1975).

15. Judged by these standards, the Bank (acting through its president, Theodore Meyer) defrauded the guarantor defendants in at least the following two respects: (1) by promising, without so intending, to establish a $50,000.00 escrow account for the purpose of covering payments defendant Galloway might fail to make on his $531,000.00 promissory note, and (2) by informing the guarantor defendants that defendant Galloway had already repaid in full the loan as to which defendant John W. Meyers had executed his earlier $63,000.00 guaranty agreement. In justifiable reliance on these two misrepresentations of fact, the guarantor defendants executed Plaintiff's Exhibits 33 and 34. Thus, unless otherwise barred as a legal defense, either instance of fraud would re-

lieve these defendants of liability on their guaranty agreements. 17 Am.Jur.2d *Contracts* § 151 (1964).

16. Arguing that fraud in the inducement is indeed barred as a defense to this suit, FDIC filed a motion in limine seeking the exclusion from trial of all evidence concerning fraud. We chose to admit such evidence on a conditional basis and then to rule on FDIC's motion in this written memorandum. The motion in limine rests on the following three grounds:

(1) that FDIC is a holder in due course of the guaranty agreements, and is thus not subject to the personal defense of fraud in the inducement;

(2) that as against the FDIC, such a defense is barred by the provisions of 12 U.S.C. § 1823(e); and

(3) that such a defense is barred by the Court's decision in *D'Oench, Duhme & Co., Inc. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

17. Because FDIC did not acquire these guaranties in the "regular course of business," it fails to qualify as a holder in due course under the Kansas Uniform Commercial Code. *See* K.S.A. 84–3–302(3)(c), discussed *supra*. As noted in our discussion of the promissory notes, the federal common law holder in due course rule has abandoned this "regular course of business" requirement. *See Gunter*, 674 F.2d at 872–73. Nonetheless, we may not automatically conclude that, as to these guaranties, FDIC is a holder in due course under federal common law. Two questions must still be addressed. First, does FDIC meet all the *other* U.C.C. holder in due course requirements (*i.e.*, aside from the "ordinary course of business" element)? And second, assuming FDIC fails to satisfy one or more of those other U.C.C. requirements, does the federal common law holder in due course rule *mandate* compliance with those other requirements?

18. Even aside from the "ordinary course of business" requirement, FDIC fails to qualify as a holder in due course of the guaranties under the Kansas U.C.C. Under the Code, a holder in due course is a holder who takes an "instrument." K.S.A. 84–3–302(1). The same U.C.C. article defines "instrument" as a *"negotiable* instrument." K.S.A. 84–3–102(1)(e) (emphasis added). Only those documents meeting the requirements of K.S.A. 84–3–104(1) are negotiable instruments. Where the Kansas courts have considered guaranty agreements, they have held them *not* to be negotiable instruments.

For instance, the guaranty agreement at issue in *Halpin v. Frankenberger*, 231 Kan. 344, 644 P.2d 452 (1982), was remarkably similar to those introduced as Plaintiff's Exhibits 33 and 34. After engaging in the above analysis, the *Halpin* court concluded, "The guaranty agreement does not comply with 84–3–104 in several respects and therefore 84–3–606 [regarding discharge through impairment of collateral] does not apply." 231 Kan. at 349, 644 P.2d at 456. The court in *Kansas State Bank & Trust Co. v. DeLorean*, 7 Kan.App.2d 246, 640 P.2d 343 (1982), *rev. denied*, 231 Kan. 800 (1982), was even more emphatic. The court flatly stated: "The document in question is not a negotiable instrument but rather a separate contract of guaranty. Thus, the UCC provision is not applicable." 7 Kan.App.2d at 256, 640 P.2d at 351.

Although not explained in either of these Kansas decisions, the basis for holding that a guaranty agreement is not a negotiable instrument is rather obvious. To be "negotiable," an instrument must "contain an *unconditional promise* or order to pay a sum certain in money...." K.S.A. 84–3–104(1)(b) (emphasis added). Because the guarantor defendants waived their right to require the Bank to proceed against Jack Galloway before enforcing the guaranty agreements, those agreements are properly termed "unconditional guaranties." *See DeLorean*, 7 Kan.App.2d at 255, 640 P.2d at 350. But a guaranty is by its very nature a *conditional promise* to pay. That is, a guarantor promises to pay only on the condition that the principal debtor fails to pay. A creditor may not refuse a tender of payment by the principal debtor and then force the guarantor to make good

on his guaranty. 38 C.J.S. *Guaranty* § 77(c) (1943). It is in that sense that these guaranty agreements are conditional. Because they contain no unconditional promise to pay, the guaranties are not negotiable instruments. FDIC could thus never qualify as a holder in due course of the guaranties under the Kansas U.C.C. K.S.A. 84–3–302(1), –102(1)(e), –104(1)(b).

Under the Kansas U.C.C., FDIC fails to qualify as a holder in due course of these guaranties on yet another ground. A negotiable instrument must "be payable to order or to bearer." K.S.A. 84–3–104(1)(d). Even if these guaranties otherwise qualified as negotiable instruments, failure to meet this requirement means "that there can be no holder in due course of such an instrument." K.S.A. 84–3–805. An examination of these guaranties (set out verbatim in finding number 20) reveals no compliance with this "payable to order or to bearer" requirement. On this alternative ground, then, FDIC fails to qualify as a holder in due course of the guaranties under the Kansas U.C.C.

■ 19. Because nearly every case decided under the federal common law holder in due course rule has involved a promissory note, there is little authority as to whether that rule applies to documents which fail to qualify as U.C.C. negotiable instruments. Indeed, the rule itself is generally phrased in terms of a "note" acquired by the FDIC. *See Wood,* 758 F.2d at 161; *Gunter,* 674 F.2d at 873. Only in one reported decision was this issue addressed. The court in *F.D.I.C. v. Gulf Life Ins. Co.,* 737 F.2d 1513 (11th Cir.1984), held that the FDIC *could* obtain holder in due course status as to a non-negotiable instrument (there, an unearned insurance premium refund). Because we disagree with both the analysis and result of the *Gulf Life* court, we find it necessary to quote from certain portions of that opinion.

The *Gulf Life* court began by drawing a parallel between its case and that same circuit's earlier decision in *Gunter v. Hutcheson,* 674 F.2d 862 (involving a nego-

tiable promissory note purchased by the FDIC):

> *Gunter* dictates that federal law govern this case because the rights and obligations of the FDIC are at stake. The considerations identified by the Supreme Court in *Kimbell Foods* as being pertinent in deciding whether state law should form the content of that federal law are: first, whether the federal program by its nature requires national consistency; second, whether state law would frustrate specific goals of the federal program; and third, the extent to which a uniform federal rule would upset state-based commercial relations. 440 U.S. at 728–29, 99 S.Ct. at 1458–59.

737 F.2d at 1517 (citing *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)). After concluding that the first two considerations argued *against* the application of state law to the instrument at issue there, the *Gulf Life* court continued:

> As in *Gunter,* the third *Kimbell Foods* factor points toward employing state law as the federal rule of decision, but not with sufficient force to overcome the pull of the first two considerations. The *Gunter* court noted that the alleged adverse effect of a uniform protective rule on settled commercial expectations grounded in state law was largely illusory because the FDIC would carry a shield no greater than that possessed by a holder in due course—a much more likely transferee than the FDIC. *See id.* at 872. The asset involved in the present case, however, is not a negotiable instrument, which strengthens the effect of the third *Kimbell* factor.
>
> *Gunter*'s comparison of the FDIC to a holder in due course is nevertheless apt. In the majority of cases in this circuit in which the obligor has sought to avoid payment to the FDIC, the obligation has been embodied in a note. In the common situation where a note is a negotiable instrument, estoppel, waiver, and unjust enrichment are defenses to which a holder in due course would be impregnable. *See* U.C.C. § 3–305(2). *Gunter's analy-*

*sis thus persuades us that in the majority of cases little dashing of commercial expectations would result from a uniform federal rule protecting the FDIC from such defenses.*

737 F.2d at 1517–18 (emphasis added; citations omitted).

This analysis seems entirely reasonable until one reaches the highlighted sentence. The reason there is little dashing of commercial expectations in cases involving negotiable instruments is that one who signs such an instrument can reasonably expect that he will eventually be asked to pay a holder in due course. Granting the FDIC holder in due course status after a bank's failure thus imposes no greater liability on the maker/drawer of a negotiable instrument than he had reasonably expected to bear. However, one who signs a *non*-negotiable instrument reasonably expects to *avoid* having to contend with a holder in due course. In our opinion, the *Gulf Life* court underestimated the extent to which its result dashes the latter party's commercial expectations.

That may contribute to what we see as an even greater error. It strains logic to suggest that because a rule makes sense in "the majority of cases" (*i.e.*, when a negotiable instrument is involved), it should therefore be applied to all other cases. Having determined that different considerations apply to non-negotiable instruments, the *Gulf Life* court should logically have determined if an alternative rule were feasible. In our view, such an alternative rule is entirely feasible.

Because the U.C.C. has been widely adopted, nearly every state has the same definition of "negotiable instrument." Thus, the FDIC can easily separate a failed bank's financial instruments into negotiable and non-negotiable categories. Protected by the holder in due course rule, the FDIC would have no need to engage in a close examination of the negotiable instruments. Assuming, as did the *Gulf Life* court, that most of a failed bank's instruments would be negotiable, the FDIC should be able to examine the non-nego-

tiable instruments in some detail. To account for possible personal defenses, the FDIC might discount the price it would pay for such instruments. Again, given the apparently small number of non-negotiable instruments, the overall effect of such discounting should be minimal.

■ Not only would such an alternative rule be feasible for the FDIC, it would clearly be more equitable for parties to non-negotiable instruments. By choosing not to comply with the requirements for negotiability, one who executes a non-negotiable instrument makes a conscious decision *not* to waive any personal defenses he might have. Similarly, a bank's acceptance of a non-negotiable instrument is presumably a voluntary act. Indeed, logic suggests that parties would structure their financial transactions quite differently if another party were allowed to announce that a previously non-negotiable instrument were suddenly to have all the attributes of negotiability. Where non-negotiable instruments are obtained by the FDIC, then, we would "decline to override intricate state laws of general applicability on which private creditors base their daily transactions." *Kimbell Foods, supra,* 440 U.S. at 729, 99 S.Ct. at 1459. We conclude that, as to non-negotiable instruments, federal common law incorporates such state laws. This federal rule thus denies FDIC holder in due course status as to these guaranty agreements.

■ 20. Because FDIC lacks holder in due course status as to these guaranty agreements under either the Kansas Uniform Commercial Code or federal common law, the guarantor defendants may raise the personal defense of fraud in the inducement.

■ 21. Alternatively, FDIC attempts to defeat the guarantor defendants' reliance on the defense of fraud in the inducement by citing 12 U.S.C. § 1823(e). That subsection provides that:

No agreement which tends to diminish or defeat the right, title or interest of the [Federal Deposit Insurance] Corporation

in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have [been] executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the assets by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

22. Thus, where fraudulent inducement is the result of an *agreement*, an otherwise valid defense may be barred by 12 U.S.C. § 1823(e). *See F.D.I.C. v. Rodenberg*, 571 F.Supp. 455, 459 (D.Md.1983). By the same token, however, where fraudulent inducement does *not* take the form of an agreement, section 1823(e) is inapplicable. *F.D.I.C. v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1516 (11th Cir.1984); *F.D.I.C. v. Merchants National Bank of Mobile*, 725 F.2d 634, 639 (11th Cir.1984), cert. denied, —— U.S. ——, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984); *Gunter, supra,* 674 F.2d at 867; *F.D.I.C. v. Kucera Builders, Inc.,* 503 F.Supp. 967, 971 n. 2 (N.D.Ga.1980).

■ 23. In *D'Oench, Duhme, supra,* the Court held that, as against the FDIC, the maker of a note may not plead as a defense his own scheme to deceive bank regulators (*i.e.,* by asserting that a secret agreement existed between himself and the bank). Estoppel under such circumstances does not require proof of actual intent to deceive on the part of the note's maker. Rather, "one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners." 315 U.S. at 460, 62 S.Ct. at 680–81. The elements of *D'Oench, Duhme* estoppel are thus as follows: "(1) the FDIC must be the party against whom the claim or defense is as-

serted, and (2) the party asserting the claim or defense must have lent himself (3) to a secret agreement (4) that deceived or would tend to deceive the FDIC." *In Re Longhorn Securities Litigation,* 573 F.Supp. 278, 280–81 (W.D.Okla.1983).

■ 24. Of the two instances of fraud in the inducement described in conclusion 15, *supra,* the first does involve an agreement between the Bank and the guarantor defendants. That is, the Bank agreed to establish a $50,000.00 escrow account in partial consideration for the defendants' agreement to guarantee Galloway's promissory note. The defendants' reliance on that instance of fraud in the inducement is thus barred as a defense by both 12 U.S.C. § 1823(e) and the *D'Oench, Duhme* doctrine.

■ 25. The other instance of fraud in the inducement, however, involved no agreement. Theodore Meyer, the Bank's president, simply misrepresented to the guarantor defendants that Galloway had repaid in full the loan as to which defendant John W. Meyers had executed his earlier guaranty agreement. Therefore, neither 12 U.S.C. § 1823(e) nor the *D'Oench, Duhme* doctrine would defeat the guarantor defendants' reliance on this instance of fraud in the inducement. As to the guaranty agreements introduced as Plaintiff's Exhibits 33 and 34, then, FDIC is in no better position than the Bank would have been. That is, the guarantor defendants have a complete defense to a suit based on those agreements.

26. Having concluded that the guarantor defendants may rely on the defense of fraud in the inducement, we hereby overrule FDIC's motion in limine.

### ORDER

IT IS THEREFORE ORDERED that judgment be entered in favor of plaintiff Federal Deposit Insurance Corporation and against defendants Jack Galloway and Jack Galloway, d/b/a Jack's Excavating, a/k/a Jack's Excavating Co. (jointly and severally) in the amount of $1,068,578.25, plus

interest of $209.74 per day from April 16, 1985.

IT IS FURTHER ORDERED that judgment be entered in favor of defendants John W. Meyers, Jr., Lorna M. Meyers, Harry D. Sharp, and Brenda C.M. Sharp, and against plaintiff Federal Deposit Insurance Corporation.