**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff, Appellee,**

v.

**P.L.M. INTERNATIONAL, INC., et al., Defendants, Appellees.**

**Antonio Melendez and Martha Melendez, Defendants, Appellants.**

**No. 87–1435.**

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1987.

Decided Dec. 7, 1987.

Rurico S. Diaz-Aponte with whom Hector L. Marquez, Hector R. Ramos and Oreste V. Ramos were on brief for defendants, appellants.

Gabriel Hernandez Rivera with whom Feldstein, Gelpi, Hernandez & Gotay, Thomas A. Rose, Deputy Gen. Counsel, Rae Schupack, Regional Counsel, and John David Ferrer, Counsel, were on brief for plaintiff, appellee.

Before BOWNES and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

BOWNES, Circuit Judge.

Defendants-appellants Antonio and Martha Melendez and their conjugal partnership appeal an order of the United States District Court for the District of Puerto Rico entered in accordance with a stipulation for judgment holding them liable as guarantors of a mortgage loan obtained by Vistas de Camuy Development Corporation, Inc. (Vistas) from the Girod Trust Company (Girod). Defendants argue that the substitution of the debtor in the principal loan and pledge agreement extinguished their ancillary obligation, and that even if their obligation survived the modification of the original agreement, a subsequent release relieved them of all liability. Plaintiff-appellee, the Federal Deposit Insurance Corporation (FDIC), counters that no novation occurred and that the release failed to meet the requirements of 18 U.S. C. § 1823(e), which protects the FDIC from agreements tending to defeat or diminish its interests in assets held in its corporate capacity. We agree with the FDIC and affirm the judgment of the court below.

I. BACKGROUND

This case arises out of a series of transactions involving Girod and the corporate developers of a housing project called "Urbanizacion Vistas de Camuy." The transactions date to November 13, 1980, when Girod and Vistas entered into an agreement whereby the bank loaned the corporation $538,136.41 to purchase a tract of real

* Of the District of Massachusetts, sitting by designation.

estate for the housing project. Vistas executed a mortgage note for $555,000 payable to the bearer on demand and a mortgage deed guaranteeing the note. On the same day, Vistas gave two notes totalling $250,000 to Mr. and Mrs. Luis Gilberto Rivera–Rivera secured by a second mortgage on the property.

Over one year later, on December 31, 1981, Vistas and Girod entered into a second agreement. Girod loaned the corporation a total of $5,800,240 of which approximately $3 million was available on a revolving basis as the maximum outstanding amount. This loan was secured in two ways. First, Vistas executed a mortgage deed amending and amplifying the original mortgage note of $555,000. In that document, Mr. and Mrs. Luis Gilberto Rivera–Rivera agreed that the new mortgage would have priority over the mortgage which guaranteed their notes of November 13, 1980. Second, the principals of Vistas—defendants and Mr. and Mrs. Manuel Molina Godinez—signed a letter of continuing guaranty. The agreement obligated the parties to guarantee all loans for which Vistas was liable up to a maximum liability for each of the parties of $3,015,000. The agreement provided in pertinent part:

> This is a continuing guarantee given in order to induce you to enter into, and make loans under a certain Loan and Pledge Agreement ... between you and VISTAS DE CAMUY DEVELOPMENT CORPORATION for the financing of the construction of a housing project in Camuy, Puerto Rico, and this guarantee will not be revoked by the undersigned until such time as the above-mentioned Loan and Pledge Agreement, (*as the same may be amended from time to time ... without the the consent of or notice to the undersigned*) and all terms thereof shall have been fully complied with by all parties and the housing project contemplated thereby shall have been fully completed.

(Emphasis added).

The third major transaction involving the Vistas de Camuy housing project took place on February 28, 1983. A second corporate developer, PLM International, signed a loan and pledge agreement with Girod for a principal amount of $8,700,000 —with $3,500,000 (later increased to $4,500,000) available on a revolving basis. Girod secured the loan with a third mortgage on the Vistas property. On June 24, 1983, PLM and Vistas executed a deed of sale whereby PLM acquired the encumbered real estate in exchange for the assumption of Vistas' debts incurred in the development project. Work on the housing project continued under the Vistas name.

On April 17, 1983, Girod, Vistas, PLM, defendants, and Mr. and Mrs. Manuel Molina–Godinez executed an agreement releasing Vistas, the defendants, and the Molina–Godinezes from all obligations in relation to the Vistas de Camuy development. While common practice in Puerto Rico requires one to "pick up a note"—i.e., to physically retrieve a note upon discharge—the defendants did not demand the return of their letter of guaranty nor did they pick it up. The guaranty remained in the active collateral file of Girod, without any notation of cancellation.

The final transaction involving the Vistas project occurred on November 15, 1983, three years after the commencement of the development. PLM cancelled the mortgage guaranteeing the notes held by Mr. and Mrs. Luis Gilberto Rivera–Rivera, leaving Girod as the sole holder of a mortgage on the encumbered land.

The FDIC became involved in the transaction almost one year later. The Secretary of the Treasury of the Commonwealth determined that Girod was in unsound financial condition. Pursuant to P.R. Laws Ann. tit. 7, § 201 (1982), the Secretary closed the bank, assumed its management and administration for purposes of liquidation, and appointed the FDIC as receiver, 12 U.S.C. § 1821(e), on August 16, 1984. Three days later, the FDIC, in its corporate capacity, entered into a purchase and assumption agreement whereby it acquired some of the assets of Girod—including the mortgage executed by Vistas and the continuing letter of guaranty executed by defendants.

The FDIC filed the instant action in February 1985. The complaint named PLM as debtor on certain promissory notes due Girod, Vistas as maker of the mortgage note pledged to Girod, and defendants as guarantors of the Vistas mortgage obligations. The court entered a default judgment against PLM and Vistas; the mortgage was foreclosed and the encumbered land sold pursuant to a judicial sale. Meanwhile defendants answered the complaint,[1] and asserted the release as an affirmative defense. Defendants moved for summary judgment which the district court denied. In an opinion and order dated March 10, 1987, the court held that (1) no novation occurred releasing defendants from their obligations under the guaranty agreement, and (2) the release failed to meet the criteria of 12 U.S.C. § 1823(e) and thus could not be enforced against the FDIC. The parties subsequently filed a stipulation for judgment in the principal amount of $3,015,000 plus interest and costs which the district court approved. The stipulation reserved the defendants' right to appeal.

## II. NOVATION

■ Defendants argue that the February 28, 1983 loan agreement between PLM and Girod constituted a novation which extinguished both the obligation of Vistas and the ancillary guaranty. They contend that this novation released them of all liability. The FDIC characterizes the agreement differently: the loan and pledge agreement was the third and final step in a series of transactions by which Girod financed the Vistas de Camuy housing project, and as such, that agreement further encumbered the real estate and obligated PLM in addition to Vistas, without affecting any prior agreements executed to secure previous loans.

The Civil Code of Puerto Rico establishes stringent requirements for novation. While defendants correctly note that the extinction of a principal obligation also extinguishes all accessory obligations, P.R.

Laws Ann. tit. 31, § 3245 (1968), not every modification of an agreement produces extinction. *See Francisco Garraton, Inc. v. Lanman & Kemp–Barclay & Co.*, 559 F. Supp. 405, 407 (D.P.R. 1983) ("Novation is never presumed. The will to novate must be express and it must be established without a trace of doubt.") (citing *Warner Lambert Co. v. Superior Court*, 101 P.R.R. 527, 544, 545 (1973)). The Civil Code requires that the extinction of one obligation by another either be expressly declared or compelled by the incompatibility of the two agreements. *See* P.R. Laws Ann. tit. 31, § 3242 (1968); *Francisco Garraton*, 559 F. Supp. at 407 ("In the absence of an express declaration, extinctive novation operates only when the two obligations are absolutely incompatible. There must be such a radical change in the nature of the new obligation when compared with the old as to make them mutually excludable and unable to coexist.") (citing *G. & J., Inc. v. Dore Rice Mill, Inc.*, 108 D.P.R. 89, 96 (1978)); *Colon & Cia., Inc. v. Registrar*, 88 P.R.R. 64, 82 (1963) (same).

In the present case, neither prerequisite for novation exists. The February 28 agreement does not expressly state an intention to extinguish previous obligations. Nor does that agreement so completely contravene prior obligations as to necessitate novation. Although the substitution of the debtor may sufficiently modify an obligation so as to cause novation under Puerto Rico law, *see* P.R. Laws Ann. tit 31, § 3241 (1968) ("Obligations may be modified ... [b]y substituting the person of the debtor."), the substitution—absent an express declaration of novation—must meet the high standard of complete incompatibility. Yet rather than working a radical change in the nature of the underlying obligations, the agreements at issue here complement and build upon one another. At oral argument, defendants conceded that the effect of the February 28 agreement was to allow PLM to borrow addition-

---

1. The initial default judgment of March 27, 1985, covered all of the defendants to the action, including the defendants-appellants. The latter, however, requested the court to set aside the judgment and to grant time to answer the complaint or to otherwise plead. The entry of default was set aside on April 19, 1985.

al money on the already encumbered real estate so as to carry on the Vistas de Camuy housing project. PLM assumed the obligations of Vistas; it did not create new and incompatible obligations. In fact, on June 24, 1983, Vistas acknowledged the survival of its debt to Girod, and it transferred the title and possession of the Vistas de Camuy project to PLM in exchange for the assumption by PLM of those debts.

Absent a novation of Vistas' obligations, the February 28 agreement had no effect upon the ancillary obligations of the defendants as guarantors. The letter of guaranty secured all loans "on which the borrower is or may be liable as maker." Furthermore, the letter stated that defendants' guaranty would not be revoked until all terms of the December 31, 1981 loan and pledge agreement had been complied with and "the housing project contemplated thereby shall have been fully completed." Neither of those terms had been fulfilled by February 28, 1983. Nor had Vistas' liability on the original mortgage note been extinguished. Since Girod secured its loan to PLM with the Vistas mortgage, the defendants' guaranty applied to the Girod-PLM loan under the terms of the continuing letter of guaranty.

## III. THE RELEASE AGREEMENT

Defendants further argue that even if the February 28 agreement did not extinguish the principal obligation of Vistas, nonetheless the release executed on April 17, 1983, relieved defendants of all liability. They contend that local law applies to the letter of guaranty and the subsequent release; that said release is valid under the laws of Puerto Rico; and that they may assert the release as a defense to the FDIC action. The FDIC argues that federal law applies and contends that the release is invalid under the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq*.

■ Both the defendants' letter of guaranty and the release refer back to the loan and pledge agreement of December 31, 1981. That document specifically provided that "[t]his Agreement *and all instruments executed pursuant hereto* shall be construed in accordance with and governed by the Laws of the Commonwealth of Puerto Rico." (Emphasis added). But defendants are attempting to assert the release against the FDIC. And the Federal Deposit Insurance Act states that when the FDIC is acting in its corporate capacity, which role defendants here acknowledge, federal law shall apply except under certain circumstances not present in this case. *See* 12 U.S.C. § 1819.[2] *See also FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1106 (1st Cir. 1986) ("Federal law governs cases where ... the FDIC in its corporate capacity sues to collect assets acquired from the receiver of an insured bank.") (citations omitted); *FDIC v. Bird*, 516 F. Supp. 647, 649 (D.P. R. 1981) (same). The application of federal law works no unfair surprise in this case; defendants knew or should have known from the commencement of their relationship with Girod that they were dealing with a federally insured bank and hence subject to the provisions of federal law.

Federal law embodies a policy of protecting the FDIC from misrepresentations and secret agreements which might result in it incorrectly assessing the value of bank holdings for institutions which it insures, makes loans, or acquires in its corporate capacity. In the landmark case of *D'oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 459, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942), the Court held that persons who execute instruments and thereby lend themselves to a scheme capable of misleading the FDIC in its assessment of a bank's financial condition are estopped from defending against the enforcement of obligations under said instrument. The

**2.** 12 U.S.C. § 1819 provides in pertinent part: All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States ... except that any suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States.

*D'oench* rule does not require intent to defraud as a prerequisite to estoppel, *id.* at 461, 62 S.Ct. at 681; rather, the rule prohibits all "secret agreement[s]" which enable the parties to undermine the federal policy of protecting the FDIC from fraudulent arrangements. *Id.; accord FDIC v. de Jesus Velez,* 678 F.2d 371, 375 (1st Cir. 1982).

■ In 1950, Congress codified the federal common law prohibition against secret side agreements which tend to diminish the rights of the FDIC. Section 2[13](e) of the Federal Deposit Insurance Act provides:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

The release in question satisfies only the first of these four requirements. The document was not executed contemporaneously with the letter of guaranty; the minutes of the meeting of the board of directors and the credit committee did not refer to or discuss the release; and the release was never included in the official files of Girod. Under federal law, therefore, the release has no validity against the FDIC and affords no protection in this action.

■ Plaintiff argues, however, that section 1823(e) has no application in this case because the asset in question, the letter of guaranty, ceased to exist before its acquisition by the FDIC. Defendants rely upon *FDIC v. Merchants National Bank of Mobile,* 725 F.2d 634 (11th Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984), to support their proposition that nonconforming documents, here the release agreement, should be considered to determine the validity of an asset. That reliance is misplaced. *Merchants National Bank* involved a suit by the FDIC to collect on a loan acquired in its corporate capacity. The case turned on whether the loan as initially granted by the subsequently insolvent bank was secured by a letter of guaranty. Defendant sought to introduce documents which failed to meet the stringent requirements of section 1823(e) in order to define the parameters of the asset. The court rejected that approach:

Here [defendant] seeks to limit the contour of the asset as described in the certificate of participation ... by asserting that an ambiguity exists in the certificate and accompanying documents. Then [defendant] seeks to resolve the ambiguity it created ... by resorting to evidence not meeting Sec. 1823(e)'s requirements. Congress did not intend that Sec. 1823(e) be avoided in this manner; [defendant's] construction would drain substantial vitality from Sec. 1823(e) ... by throwing into question the very records of the bank that the statute entitles the FDIC to consider and rely upon.

725 F.2d at 639.

In the course of its analysis, the *Merchants National Bank* court did note an exception to section 1823(e) as recognized in *Gunter v. Hutcheson,* 674 F.2d 862 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), and *Howell v. Continental Credit Corp.,* 655 F.2d 743 (7th Cir.1981), but the court stressed the narrowness of those holdings. In *Gunter,* the court held that section 1823(e) did not preclude consideration of nonconforming evidence where the debtors argued that no agreement existed *from the outset* due to fraud. The court expressly distinguished the case under consideration, where the parties disputed the validity of the entire transaction from its inception, from those cases where the parties contended that a side agreement controlled the rights of the parties. *See Gunter,* 674 F.2d at 867.

Similarly, in *Howell v. Continental Credit Corp.*, the court found the bar of section 1823(e) inapplicable where a debtor contested the validity of obligations under a lease agreement which imposed *bilateral* obligations. The court distinguished its holding from those cases in which the FDIC sought to enforce a facially valid note and the makers defended solely on the basis of a separate and undisclosed agreement. *Howell*, 655 F.2d at 746–47.

The case at bar falls squarely within the ambit of section 1823(e). Defendants seek to avoid liability under the guaranty agreement by asserting the validity of a nonconforming release: a side agreement of which the FDIC had no knowledge until seven months after its acquisition of the principal asset. To permit the defendants to use the release agreement defensively to define the contours of the asset in question would, in the words of *Merchants National Bank*, "drain substantial vitality from section 1823(e)" and thereby undercut the purpose of the statute.

█ Defendants' final argument also fails as an impermissible attempt to limit the reach of section 1823(e). Defendants contend that since the letter of guaranty is a nonnegotiable instrument, citing *FDIC v. Hardt*, 646 F. Supp. 209, 211 (C.D. Ill. 1986), and *FDIC v. Galloway*, 613 F. Supp. 1392, 1400–01 (D.C. Kan. 1985), the FDIC does not qualify as a holder in due course and therefore defendants may interpose all personal defenses—including the release argument. Defendants rely heavily on the reasoning of *FDIC v. Galloway*, currently on appeal to the Tenth Circuit. *Galloway* held that to grant the FDIC holder in due course status would result in the "dashing of commercial expectations" in cases of nonnegotiable instruments. 613 F.Supp. at 1401–02. The court held that to avoid such a result, the FDIC should be denied holder in due course status on nonnegotiable instruments and instead be required to discount the value of such instruments in

making its assessment of failed banks. *Id.* at 1402.

The majority of circuits which have considered this approach have rejected it because it ignores the context in which FDIC transactions take place. When a bank insured under the FDIC system fails, the FDIC has two options by which it can fulfill its statutory duty to protect depositors. It can either liquidate the assets of the bank and pay off depositors immediately with monies from both the failed bank and federal insurance funds, or it can institute a purchase and assumption transaction whereby a new bank purchases and reopens the failed bank without any interruption in banking operations. The second option is usually preferred by the FDIC because it mitigates public unrest, eliminates the repercussions of a closed bank, and facilitates continued depositor access to funds. A purchase and assumption transaction, however, does require a quick response from the FDIC. Usually overnight, the FDIC must collect bids from the banks desiring to purchase the failed concern, consummate the sale, and isolate those assets which the purchasing bank will assume from those which the FDIC will purchase as insurer.[3] This necessity for speed has led the majority of courts of appeals to reject the idea of treating negotiable and nonnegotiable instruments differently. In *FDIC v. Gulf Life Insurance Co.*, 737 F.2d 1513 (11th Cir.1984), the court explained the dilemma which the limitation of section 1823(e) to negotiable instruments would create:

Were the FDIC subject to these defenses it would have to pursue one of two unpalatable courses. First, it could conduct its evaluations of the failed banks' assets with its current speed and detail, but be unable to make the informed judgment that is a statutory prerequisite to its participation in a purchase and assumption agreement, due to the possible existence of unknown claims to which it nonetheless would be vulnerable. Second, it could evaluate the assets

---

**3.** See *Gunter v. Hutcheson*, 674 F.2d at 865–66, for a complete description of FDIC methodology.

much more slowly and exhaustively, probing beyond the bank's records to the extent possible, at the risk of losing the going concern value of the failed bank and the public confidence that it reflects. Even then, the FDIC might not be able to form the necessary opinion. Under either branch of this Hobson's choice the FDIC's ability to enter into purchase and assumption agreements would be seriously circumscribed. This in turn would frustrate the overriding policy of promoting stability and confidence with respect to the nation's banking system.

*Id.* at 1517 (citing *Gunter*, 674 F.2d at 869–70).

In *FDIC v. Venture Contractors*, 825 F.2d 143 (7th Cir.1987), the court considered a claim closely analogous to the one at bar. Defendants, guarantors of certain promissory notes bought by the FDIC in its corporate capacity after the failure of the lending bank, argued that an oral agreement limited their liability under the guaranty. The court held that the guaranty fell squarely within the definition of asset in section 1823(e) and excluded all evidence failing to comply with the requirements of that provision. *See Venture Contractors,* 825 F.2d at 150; *accord FDIC v. Castle,* 781 F.2d 1101, 1108 (5th Cir.1986) ("We conclude that section 1823(e) clearly precludes the defendant-guarantors' assertion that the guaranty forms were not completed according to the defendants' oral agreement...."); *Public Loan Company v. FDIC,* 803 F.2d 82, 84–85 (3d Cir.1986); *FDIC v. Hatmaker,* 756 F.2d 34, 37 (6th Cir.1985) (same); *and FDIC v. Waldron,* 630 F.2d 239, 241 (4th Cir.1980) (same).

We agree with the reasoning advanced by the courts cited above and hold that section 1823(e) covers nonnegotiable as well as negotiable instruments. In the instant case, therefore, the statute precludes consideration of the release agreement because of its failure to conform to statutory requirements.

*The judgment is affirmed.*