FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, a corporate agency of the United States government, Plaintiff,

v.

Ruth DIXON, Defendant and Third–Party Plaintiff,

v.

SOUTHWESTERN DRILLING, an Oklahoma general partnership, Southwestern Drilling Management Company, an Oklahoma corporation, Southwestern Drilling Company, an Oklahoma corporation, Bill Schones, John Yoeckel, and Roger Bernstein, Third–Party Defendants.

No. 86–CV–10196–BC.

United States District Court, E.D. Michigan, N.D.

Jan. 21, 1988.

William J. Reifman, Barbara Bertok and Judi Katz, Mayer, Brown & Platt, Chicago, Ill., and Craig W. Horn, Braun, Kendrick, Finkbeiner, Schafer & Murphy, Saginaw, Mich., for FDIC.

Alan R. Miller and Joseph F. Yamin, Alan R. Miller, P.C., Birmingham, Mich., for Dixon.

David Paynter and Richard W. Thompson, Ericksen, Arbuthnot, Walsh, Paynter & Brown, Inc., San Francisco, Cal., for Southwestern Drilling, Southwestern Drilling Management Co. and Southwestern Drilling Co.

Mark R. Lezotte and Mark T. Nelson, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., and Robert A. Goodin, Diane Wear Larrabee and Elizabeth M. McQuillan, Armour, St. John, Wilcox, Goodin & Schlotz, San Francisco, Cal., for Bernstein.

Marvin D. Morgenstein, Morgenstein, Ladd & Jubilerer, San Francisco, Cal., for Yoeckel.

Craig H. Casebeer and Janet L. Cullum, Cooley, Godward, Castro, Huddleson & Tatum, Palo Alto, Cal., for Robt. Gee.

## MEMORANDUM OPINION

CHURCHILL, District Judge.

Pending motions for summary judgment require the Court to examine the parameters of 12 U.S.C. § 1823(e). Specifically, the Court must determine whether a limited partner who signed an assumption agreement is liable to the Federal Deposit Insurance Corporation ("FDIC") under the assumption agreement's terms even if the limited partnership promoters defrauded the limited partner. The Court finds that 12 U.S.C. § 1823(e) applies in this situation.

### I. THE FACTUAL SETTING

In 1981, Defendant Ruth Dixon became a limited partner in the limited partnership of Southwestern Drilling Rig No. 5 ("SWDR5"). SWDR5, an Oklahoma limited partnership, was formed in 1981 for the purpose of acquiring and operating an oil and gas drilling rig as a drilling contractor. Defendant Dixon obtained a 10 percent interest in SWDR5 by contributing $65,000 in cash and executing an assumption agreement binding herself to Penn Square Bank, N.A. ("Penn Square") for 10 percent of a $4,545,000 loan to the SWDR5 limited partnership. SWDR5 executed a note obligating the limited partnership to pay back the loan in 60 installments, but the assumption agreement signed by Defendant Dixon expressly states that "as between the undersigned [Dixon] and the Partnership [SWDR5], the obligation of the undersigned with respect to the Liabilities [on the $4.545 million loan] shall be primary and the obligation of the Partnership shall be as guarantor."

After obtaining the $4.545 million loan from Penn Square, SWDR5 purchased a drilling rig and subsequently leased the rig

to Lear Petroleum Exploration, Inc. ("Lear"). When Lear terminated the SWDR5 lease after one year, SWDR5 found itself in possession of a drilling rig with no operating company to provide rental payments on the rig.[1] Soon after the cash flows from the Lear lease ended, SWDR5 defaulted on its loan obligation to Penn Square. At that point, Dixon's share of the remaining debt under her assumption agreement exceeded $400,000.

Before Penn Square attempted to recover from Defendant Dixon on her assumption agreement, Penn Square became insolvent and the FDIC was appointed as receiver. *See Gilman v. FDIC,* 660 F.2d 688, 690 (6th Cir.1981) (explaining the FDIC's function in its capacity as receiver). In November of 1983, the FDIC, acting as receiver, transferred the claims and assets of Penn Square to Continental Illinois National Bank and Trust Company of Chicago ("Continental"). While in possession of the note and assumption agreements, Continental called the SWDR5 loan and foreclosed on the available security for the loan, including the drilling rig. Because an outstanding balance remained on the SWDR5 loan after disposal of the security, Continental pursued collection on the note and the assumption agreements.

On September 26, 1984, the FDIC purchased Continental's rights and claims in the note and assumption agreements relating to the SWDR5 loan.[2] In this transaction, the FDIC was acting in its corporate capacity, rather than as a receiver. *See FDIC v. Roldan Fonseca,* 795 F.2d 1102, 1109 (1st Cir.1986) (" 'Corporate' FDIC and 'Receiver' FDIC are separate and distinct legal entities."). Accordingly, the individual assumption agreements and the SWDR5 note were presumptively "acquired pursuant to 12 U.S.C. § 1823(e)" because they were "purchased by the FDIC in its corporate capacity." *FDIC v. Leach,* 525 F.Supp. 1379, 1384 (E.D.Mich.1981), *aff'd in part, vacated in part,* 772 F.2d 1262 (6th Cir.1985).

As holder of the SWDR5 note and the assumption agreements, the FDIC attempted to collect on the outstanding SWDR5 loan by instituting several lawsuits, including the suit filed against Defendant Dixon in this Court. Defendant Dixon filed an answer listing numerous affirmative defenses, and also filed third-party claims against various SWDR5 promoters and a counterclaim seeking a declaratory judgment. The FDIC moved for summary judgment with respect to liability in the primary action, and for summary judgment on the counterclaim, by arguing that 12 U.S.C. § 1823(e) bars the various defenses that Defendant Dixon raised in her answer and counterclaim.[3]

In her brief and at oral argument, Defendant Dixon vigorously argued that 12 U.S.C. § 1823(e) does not preclude her from asserting her defenses. The primary defense upon which Dixon attempts to rely is her claim that the SWDR5 promoters' misrepresentations fraudulently induced her to bind herself to the SWDR5 limited partnership's loan obligation.[4] Dixon argues that

---

**1.** SWDR5 sued Lear for breaking the lease, but Lear prevailed in a jury trial in May of 1987. *See Southwestern Drilling v. Lear Petroleum Exploration, Inc.,* No. 83–925–R (W.D.Okla.).

**2.** A more thorough analysis of this transaction is provided in the Court's discussion of whether the FDIC "acquired" the Dixon assumption agreement "by purchase." *See* § II D, *infra.*

**3.** 12 U.S.C. § 1823(e) states as follows:

No *agreement* which tends to diminish or defeat the *right, title or interest* of the Corporation in any *asset acquired by it* under this section, *either as security for a loan or by purchase,* shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank. (emphasis added).

**4.** The case at bar is atypical in the sense that most FDIC collection cases involve allegations of fraud perpetrated by the failed bank. *See, e.g., FDIC v. Hatmaker,* 756 F.2d 34, 36–37 (6th Cir.1985). Defendant Dixon's allegation of fraud is based strictly on alleged misrepresentations made to her by SWDR5 promoters.

her fraud in the inducement defense is not barred by 12 U.S.C. § 1823(e) because that provision is inapplicable for a host of reasons. First, Dixon contends that SWDR5's misrepresentations to her do not amount to an "agreement" within the meaning of section 1823(e). Second, Dixon insists that the FDIC does not have a "right, title or interest" in the assumption agreement because she is entitled to rescission based on fraud in the inducement. Third, Dixon claims that her assumption agreement, unlike a note, is not an "asset" within the meaning of section 1823(e). Fourth, Dixon maintains that further discovery is necessary to discern whether the FDIC obtained the assumption agreement "either as security for a loan or by purchase." Finally, Dixon suggests that additional discovery may produce documentation that meets the four criteria for an exception to section 1823(e), and therefore defeats the FDIC's right to recover under the assumption agreement. In short, Dixon contests every single aspect of the FDIC's claim that 12 U.S.C. § 1823(e) applies in this case. Guided by federal law, the Court must evaluate each term in section 1823(e) before applying the statute to the case at bar. *See FDIC v. Armstrong*, 784 F.2d 741, 744 (6th Cir. 1986) ("As a general rule, federal law controls in [FDIC] collection cases.").

## II. SECTION 1823(e): PREREQUISITES AND IMPLICATIONS

"By its terms, [12 U.S.C. § 1823(e) ] protects the FDIC from unwritten agreements that otherwise might be asserted to diminish or defeat its rights in assets acquired from a failed bank." *FDIC v. Leach*, 772 F.2d 1262, 1267 (6th Cir.1985). While section 1823(e) does not of itself authorize holder in due course status for the FDIC, *FDIC v. The Cremona Co.*, 832 F.2d 959, 964 (6th Cir.1987); *FDIC v. Wood*, 758 F.2d 156, 159 (6th Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985), it clearly "manifests a congressional intent to protect the FDIC." *Wood*, 758 F.2d at 159. Thus, the application of section 1823(e) places the FDIC in a uniquely favorable position with respect to collection. *Cf. Leach*, 772 F.2d at 1267; *Roldan Fonseca*, 795 F.2d at 1106 ("By Section 1823(e) Con-

gress gave the FDIC special protections not available to ordinary holders of commercial paper which are not dependent upon whether the FDIC would qualify as a holder in due course under state law.").

Defendant Dixon's various challenges to the propriety of applying 1823(e) to foreclose her fraud in the inducement defense necessitate careful consideration of the specific terms employed by Congress in section 1823(e). The most expeditious method for analyzing the applicability of section 1823(e) is to undertake a term-by-term examination of the statute.

### A. Is a third party's misrepresentation an "agreement"?

Defendant Dixon argues that the misrepresentations allegedly made to her by the SWDR5 promoters do not constitute "agreements" within the meaning of section 1823(e), even though she intends to use these alleged misrepresentations as the basis for her defense of fraud in the inducement. Dixon takes the position that "agreements" under section 1823(e) only include misrepresentations made by failed banks who are the named obligees on the instruments. From this starting point, Dixon concludes that the misrepresentations made to her by the SWDR5 promoters, rather than by Penn Square, are beyond the reach of section 1823(e), and thus can be used "to diminish or defeat the right, title or interest" of the FDIC in the assumption agreement that she signed. *See* 12 U.S.C. § 1823(e).

This argument was thoroughly considered and expressly rejected by the Fifth Circuit in *Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355, 360–61 (5th Cir.1981), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982). Applying section 1823(e) despite improper actions taken by a party other than the failed bank, the *Chatham Ventures* court noted that the language of the statute "makes no express exception for agreements initiated by a third party and the obligors." *Id.* In determining that the obligor's dealings with third parties are " 'of no consequence' in

deciding whether the FDIC may invoke the protection of section 1823(e)," *id.* at 360, the court rejected the contention that the legislative history of 1823(e) compels recognition of the rule urged by Defendant Dixon. *See id.* at 360 n. 9 (citing 86 Cong.Rec. 10,731 (1950)).

The conclusion of the *Chatham Ventures* court is wholly consistent with the United States Supreme Court's recent explanation of an "agreement" under 12 U.S.C. § 1823(e). *See Langley v. FDIC,* — U.S. —, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). Writing for the unanimous Court in *Langley,* Justice Scalia outlined a broad definition of the term "agreement" as it appears in section 1823(e). Specifically, the *Langley* Court stated that "[a] condition of payment . . ., including the truth of an express warranty, is part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach." *Id.* at —, 108 S.Ct. at 403. Rejecting the approach of *Gunter v. Hutcheson,* 674 F.2d 862, 867 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed. 2d 63 (1982), upon which Defendant Dixon relies, the Court in *Langley* held that "in an action brought by the FDIC in its corporate capacity for payment of a note, § 1823(e) bars the defense that the note was procured by fraud in the inducement even when the fraud did not take the form of an express promise." *Langley,* — U.S. at —, 108 S.Ct. at 400.

In expressing the opinion that the term "agreement" must assume a broad meaning "in § 1823(e) if that section is to fulfill its intended purpose," *id.* at —, 108 S.Ct. at 401, the *Langley* Court was particularly concerned with the FDIC's ability "to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." *Id.* at —, 108 S.Ct. at 401. In this respect, the narrow definition of an "agreement" urged by Dixon represents a substantial threat to the FDIC's evaluation process because Dixon's defense arises from discourse between individuals with no

direct ties to the failed bank (Penn Square) or to the FDIC. In short, the rule proposed by Defendant Dixon would virtually eviscerate the protection that the *Langley* Court characterized as indispensable to the FDIC. *See id.* at —, 108 S.Ct. at 401–02.

In light of logical considerations posited by *Langley,* and based on the express holding of *Chatham Ventures,* the Court finds that the misrepresentations allegedly made to Dixon by the SWDR5 promoters fall within the definition of an "agreement" in the context of section 1823(e).

### B. Does the FDIC have a "right, title or interest"?

■ The Court in *Langley* conclusively determined that voidable title "is enough to constitute 'title *or* interest' " within the meaning of section 1823(e). *Langley,* — U.S. at —, 108 S.Ct. at 402 (emphasis in original). Additionally, the Court explained that fraud in the inducement renders instruments "voidable but not void." *Id.* at —, 108 S.Ct. at 402 (citing collected authorities). Consequently, Defendant Dixon's fraud in the inducement argument cannot deprive the FDIC of "right, title or interest" in the assumption agreement signed by Dixon.[5]

### C. Is an assumption agreement an "asset"?

■ Defendant Dixon and several third-party defendants claim that an assumption agreement, unlike a note, is not an "asset" for the purpose of section 1823(e). Although the Court can find no reported decision that expressly indicates whether an assumption agreement is such an "asset," several cases strongly suggest that an assumption agreement falls squarely within the ambit of 1823(e).

In *FDIC v. P.L.M. Int'l, Inc.,* 834 F.2d 248 (1st Cir.1987), the First Circuit determined that a personal, ancillary letter of guaranty comes within the purview of section 1823(e). *Id.* at 252. The *P.L.M.* court

**5.** The Court recognizes that "[k]nowledge of the misrepresentation by the FDIC prior to its acquisition of the [Dixon assumption agreement] is not relevant to whether § 1823(e) applies." *Langley,* — U.S. at —, 108 S.Ct. at 402.

was unimpressed by the defendants' assertion "that since the letter of guaranty is a nonnegotiable instrument, the FDIC does not qualify as a holder in due course and therefore defendants may interpose all personal defenses." *Id.* (citations omitted). Rather, the *P.L.M.* court characterized this argument as "an impermissible attempt to limit the reach of section 1823(e)." *Id.; see also FDIC v. Powers,* 576 F.Supp. 1167, 1169 (N.D.Ill.1983), *aff'd without opinion,* 753 F.2d 1076 (7th Cir.1984) (holding that "facially sufficient written guarantees [must] be considered assets under § 1823(e)."); *cf. FDIC v. Van Laanen,* 769 F.2d 666, 666–67 (10th Cir.1985) (holding that obligor "was estopped from denying liability on [his] assumption agreement" in action by "FDIC, as receiver for Penn Square Bank.").

Defendant Dixon and the third-party defendants rely on *Amoroso v. Southwestern Drilling Multi–Rig Partnership No. 1,* No. 84–8019, slip op. at 3–5 (N.D.Cal. Nov. 14, 1986), to support their contention that Dixon's assumption agreement is not a section 1823(e) "asset." The *Amoroso* decision, however, is inapposite because it does not involve 1823(e). Rather, the *Amoroso* court allowed a fraud in the inducement defense to potentially defeat a *lending bank's* effort to collect on assumption agreements. *Id.* at 4–5 (court denied bank's motion for summary judgment on assumption agreements in light of possible fraud in the inducement defense). The case at bar, by contrast, involves an FDIC claim on an assumption agreement that implicates the full protection of section 1823(e). Although Penn Square's efforts to collect on the Dixon assumption agreement would be impeded by the defense of fraud in the inducement, section 1823(e) provides the FDIC with special protections that apply irrespective of the FDIC's status as a holder in due course. *Roldan Fonseca,* 795 F.2d at 1106. Consequently, *Amoroso* affords no assistance to the Court in its determination of whether Dixon's assumption agreement is an 1823(e) "asset." Supported by the rationale of *P.L.M.* and *Powers,* the Court finds that Dixon's as-

sumption agreement is an "asset" for the purpose of 12 U.S.C. § 1823(e).

### D. Has the FDIC "acquired" the assumption agreement "by purchase"?

■ In furtherance of its motion for summary judgment, the FDIC filed an "Assignment of Agreements" form executed by Continental. This document memorializes the specific transaction through which Continental transferred "all right and claim" in the SWDR5 note and the Dixon assumption agreement "to the FDIC." Despite the existence of this document, Defendant Dixon contends that additional discovery may indicate that the FDIC did not, in fact, "acquire" the assumption agreement "by purchase." Having reviewed Defendant Dixon's arguments in conjunction with the documents relating to Continental's transfer of the Dixon assumption agreement to the FDIC, the Court can only identify a single basis for Dixon's claim that the FDIC did not "acquire" the assumption agreement "by purchase".

The FDIC, in its corporate capacity as insurer, *see In re F & T Contractors, Inc.,* 718 F.2d 171, 176–77 (6th Cir.1983), assumed "the obligation of Continental Bank to repay $3.5 billion then owing by Continental Bank" to the Federal Reserve Bank of Chicago. *See* Implementation Agreement, Art. 1.1 (agreement of August 23, 1984 among FDIC and various Continental business entities). As compensation for the FDIC's infusion of $3.5 billion, Continental "deliver[ed] to the FDIC an unsecured, unsubordinated note in the amount of $1.5 billion," *id.* Art. 2.1(b), and agreed to "grant, sell, assign, transfer, convey and deliver to FDIC" $3.0 billion in outstanding loans. *Id.* Art. 2.1(a). The Implementation Agreement provided Continental with the option of tendering "additional Transferred Loans" to the FDIC in satisfaction of the $1.5 billion note. *Id.* Art. 2.2.

The SWDR5 note and the Dixon assumption agreement ostensibly passed from Continental to the FDIC as part of the FDIC's intervention and settlement with Continental. To the extent that loan obli-

gations transferred from Continental to the FDIC produce funds sufficient to satisfy Continental's entire obligation to the FDIC, "the FDIC shall transfer to Continental Bank the remaining Transferred Loans...." *Id.* Art. 4. In this respect, the FDIC foreseeably may return the Dixon assumption agreement to Continental, although the FDIC's current collection action on the assumption agreement suggests the contrary.

If the assumption agreement is passed back to Continental, Dixon will be able to assert her fraud in the inducement defense against subsequent collection efforts without having to overcome the major obstacle of section 1823(e). In the hands of any party other than the FDIC that is not a holder in due course, Dixon's assumption agreement may be subject to rescission based on fraud in the inducement. So long as the FDIC is the party seeking recovery on the assumption agreement, though, 1823(e) bars Dixon from effectively raising her fraud in the inducement defense.

Guided by the principle that "[t]he FDIC may purchase *any* asset of an insured bank," *Chatham Ventures,* 651 F.2d at 358 (emphasis in original), the Court concludes that the FDIC "acquired" the Dixon assumption agreement "by purchase" based on the Assignment of Agreements form and related documents. *See FDIC v. O'Neil,* 809 F.2d 350, 352 (7th Cir.1987) (finding 1823(e) acquisition in context of Continental–FDIC transaction). Thus, the Court determines that section 1823(e) applies in full force.

### E. Can Defendant Dixon assert an exception to 1823(e)?

Although the Court has determined that section 1823(e) applies to the Dixon assumption agreement absent a statutory exception, Dixon argues that further discovery may produce a document that meets the four criteria necessary for an exception to 1823(e). *See* 12 U.S.C. § 1823(e). The Court finds this contention virtually inconceivable. To bring the promoters' alleged fraud within the 1823(e) exception, Defendant Dixon must produce a written document executed by Penn Square and approved by the bank's board of directors which acknowledges and ratifies the promoters' fraud as a valid limitation on Penn Square's right to collect on the Dixon assumption agreement. *Id.* The Supreme Court recently indicated that district courts should grant summary judgment more liberally "if the factual context renders [a party's] claim implausible." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (discussing Fed. R.Civ.P. 56 in antitrust context). Defendant Dixon's contention that there may be documentation to support an exception to section 1823(e) is so implausible that further discovery would merely be futile. There is absolutely no reason to believe that Penn Square would ever consent to a unilateral reduction in its right to collect on Defendant Dixon's assumption agreement. For this reason, summary judgment is appropriate on liability in the primary action, and on Defendant Dixon's counterclaim.

### III. CONCLUSION

Despite Defendant Dixon's allegation that the SWDR5 promoters fraudulently induced her to participate in the limited partnership and to execute an assumption agreement,[6] the FDIC is entitled to summary judgment with respect to liability on the Dixon assumption agreement pursuant to 12 U.S.C. § 1823(e). An appropriate order will enter.

---

6. Although Defendant Dixon's case evokes a certain degree of sympathy, this consideration *cannot* outweigh the conclusive effect of section 1823(e) and the clear congressional intent to protect the FDIC, which is embodied in the statute. *See Roldan Fonseca,* 795 F.2d at 1106; *Wood,* 758 F.2d at 159; *cf. Langley,* —— U.S. ——, 108 S.Ct. 396. Defendant Dixon's recourse, if any, is against the individuals and entities who allegedly defrauded her. *See O'Neil,* 809 F.2d at 354; *see generally* J. Moothart; Modern Banking 678 (2d ed. 1987).