**RESOLUTION TRUST CORPORATION, Plaintiff,**

v.

**TOWNSEND ASSOCIATES LIMITED PARTNERSHIP, et al., Defendant.**

No. 92–76202.

United States District Court, E.D. Michigan, S.D.

Dec. 10, 1993.

Larry E. Powe & Terri L. Giampetroni, Freeman, McKenzie Law Firm, Mt. Clemens, MI, for plaintiff Resolution Trust.

James A. Simpson and Katheryn L. Zelenock, Birmingham, MI, for defendants Townsend Associates Townsend Hotel Corp. and Anthony S. Brown Development Corp.

Arthur Y. Liss, Mt. Clemens, MI, for defendants Anthony S. Brown, Sharon R. Brown.

Joseph M. Fischer & Sandra Labovitz, Carson, Fischer & Potts, Birmingham, MI, for defendants Whirlpool Financial Corp. and Whirlpool Leasing Services.

### OPINION AND ORDER REGARDING THREE MOTIONS FOR PARTIAL SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

The above-captioned action is presently before the Court on three Motions for (Partial) Summary Judgment:

(1 and 2) Resolution Trust Corporation's and Defendants Whirlpool Financial Corporation & Whirlpool Leasing Services, Inc.'s Cross–Motions for Summary Judgment on the Whirlpool Defendants' Counter–Claim Against the RTC; and

(3) Defendants Whirlpool Financial Corporation and Whirlpool Leasing Services, Inc.'s Motion for Summary Judgment on their Cross–Claim Against Defendants Anthony and Sharon Brown.

The Court has reviewed and considered the parties various briefs in support of their respective positions on these motions, and having heard the oral arguments of the parties' attorneys at the hearing held on December 2, 1993, the Court is now prepared to rule on these matters. This Opinion and Order sets forth that ruling.

### II. FACTUAL BACKGROUND

### A. THE ORIGINAL TOWNSEND INDEBTEDNESS

In December of 1985, Townsend Associates Limited Partnership entered into a loan agreement with the Michigan Strategic Fund relating to the issuance of $8.6 million of Limited Revenue Obligation Bonds to provide funding for the construction of the Townsend Hotel in Birmingham, Michigan. The Strategic Fund loan agreement provided that Townsend Associates was to pay the interest plus 1/2th of the principal due on the bonds to the bond trustee in monthly installments prior to the date when the trustee was required to make payments to the bond holders.

In connection with its obligations under the Strategic Fund loan agreement, Townsend Associates entered into a Reimbursement Agreement with First Federal Savings Bank and Trust ("First Federal"). Under this Reimbursement Agreement, First Federal agreed to issue an Irrevocable Letter of Credit in the amount of $9 million in favor of the bond trustee to cover Townsend Associates' obligations under the Strategic Fund loan agreement. In exchange, Townsend As-

sociates agreed to repay to First Federal all amounts paid out by the bank to the bond trustee, together with all letter of credit draw fees, late charges, interest, transfer fees, costs and maintenance fees. Townsend Associates' indebtedness to First Federal was secured by a real estate mortgage on the Townsend Hotel property, a general security agreement in Townsend Hotel Corporation personalty, and the guarantees of the Townsend Hotel Corporation and Anthony and Sharon Brown.[1]

Townsend Associates defaulted on its obligations to First Federal as of November 1990. Demand for payment under the guarantees was subsequently made to Townsend Associates, and to Anthony S. Brown, Sharon R. Brown and the Townsend Hotel Corporation on their guarantees. None of the obligors made any payment on the indebtedness.

As a result, in October 1992 Resolution Trust Corporation ("RTC"), as Conservator/Receiver of First Federal Savings and Loan Association, the successor-in-interest to First Federal Savings Bank and Trust, instituted this action to foreclose on First Federal's mortgage on the Townsend Hotel property, and to collect on the guarantees of Townsend Hotel Corporation, Anthony and Sharon Brown.

In its Verified Complaint, the RTC named among its various party-defendants all parties with a recorded interest in Townsend Hotel property. Whirlpool Financial Corporation and Whirlpool Leasing Services, Inc. (collectively referred to herein as "Whirlpool" or the "Whirlpool Defendants.") are two such party-defendants. The RTC alleges in its Complaint that the Whirlpool Defendants' interest in Townsend Hotel property is subordinate to First Federal's (now RTC's) interest.

B. *WHIRLPOOL'S INTEREST IN TOWNSEND PROPERTY*

Whirlpool's interest arises out of a Loan and Security Agreement entered into between Whirlpool and the Townsend Hotel Corporation on December 2, 1988 pursuant to which Whirlpool agreed to lend the Townsend Hotel Corporation $1,646,234.09 for the financing of furniture, equipment and other personalty to be used in conjunction with the operation of the newly established Townsend Hotel. In connection with this loan, Townsend Hotel Corporation granted Whirlpool a security interest in certain furniture, equipment and personalty (the "Whirlpool Collateral"). Mark Baetens, a Vice–President of First Federal, apparently agreed to Whirlpool's request that First Federal subordinate its interest in the Whirlpool Collateral on December 1, 1988.[2] Anthony and Sharon Brown also executed a guaranty agreement, personally guaranteeing repayment of the Whirlpool loan to the Townsend Hotel Corporation.

Townsend Hotel Corporation subsequently fell delinquent in its obligations under the Whirlpool loan but asked Whirlpool to forbear in enforcing its rights under the loan agreement. On January 16, 1991, the parties entered into a Contingent Deferral and Additional Security Agreement ("CDASA") pursuant to which Whirlpool agreed to extend its lending relationship with Townsend and further agreed to forbear from enforcing its rights under the original December 1988 loan agreement. The CDASA also modified the terms of Townsend's repayment of the loan, although, most of the terms of the original loan agreement and supporting documents were ratified in the CDASA. As part of the consideration for Whirlpool's agreement to the CDASA, Anthony and Sharon Brown executed a new personal guarantee of Townsend Hotel Corporation's debt on February 18, 1991. This new guarantee, by its express terms, superseded and replaced the Browns' December 2, 1988 guarantee.

Despite Whirlpool's forbearance, however, Townsend and the Browns did not meet their obligations and, once again, defaulted.

---

1. Anthony Brown is the principal shareholder of Defendant Anthony S. Brown Development Company, a principal shareholder in Defendant Townsend Hotel Corporation and the general partner of Defendant Townsend Associates Limited Partnership.

2. Apparently, in his deposition, Mr. Baetens testified that the signature on the subordination agreement looked like his, but he had no recollection of signing it.

After being served with RTC's Verified Complaint in this action in which RTC alleged that its security interest in Townsend Hotel property was superior to the interest of Whirlpool, Whirlpool responded with a Counterclaim against RTC, in which Whirlpool claimed an interest superior to RTC's by virtue of Mark Baetens' execution of the subordination agreement on December 1, 1988 on behalf of First Federal. Whirlpool also cross-claimed against Anthony and Sharon Brown to collect on their guarantee.

## A. RTC'S AND WHIRLPOOL'S CROSS-MOTIONS FOR SUMMARY JUDGMENT ON WHIRLPOOL'S COUNTER-CLAIM

As indicated above, along with their Answer, the Whirlpool Defendants filed a Counter-Claim against the RTC. In that Counter-Claim, Whirlpool alleged that when it entered into the Loan and Security Agreement with the Townsend Hotel Corporation in December 1988, Townsend Hotel Corporation granted Whirlpool a security interest in various furnishings and equipment (the "Collateral"), and that First Federal's (now RTC's) interest in the Collateral was subordinated to Whirlpool's interest pursuant to a subordination agreement executed by First Federal's Vice-President, Mark Baetens. Therefore, Whirlpool claims that it stands in a higher priority position than the RTC.

The RTC filed its Answer and Affirmative Defenses to the Whirlpool Counter-Claim. In its Affirmative Defense No. 3, the RTC alleged that:

> [Whirlpool's] claims are barred pursuant to Title 12 U.S.C. § 1823(e) for the reason that the purported subordination agreement between the Townsend Hotel Corporation and/or Townsend Hotel Limited Partnership and Whirlpool relating to the "Whirlpool Collateral", was not in a writing executed by the Bank or its successor, was

not approved by the Bank's Board of Directors or its successor, [and] it was not, and has not been, continuously from the time of its purported execution an official record of the depository institution.

[RTC's Verified Answer and Affirmative Defenses, p. 8.]

It is based upon the allegations of non-compliance with the requirements of 12 U.S.C. § 1823(e) in Affirmative Defense No. 3 that the RTC moves for summary judgment in its favor on Whirlpool's Counter-Claim. Whirlpool has cross-moved for summary judgment in its own favor, arguing that Section 1823(e) does not apply to subordination agreement transaction at issue.[3]

## B. WHIRLPOOL'S MOTION FOR SUMMARY JUDGMENT ON THE BROWNS' CROSS-CLAIM

Whirlpool has also moved for summary judgment in its favor on its Cross-Claim against Defendants Anthony and Sharon Brown. Whirlpool's Cross-Claim against the Browns is predicated upon their personal Guaranty of the $1.6 million loan made by Whirlpool to the Townsend Hotel Corporation for the financing of Hotel furnishings and equipment.

The Browns do not deny their execution of the Guaranty, nor do they deny the Townsend Hotel Corporation/Townsend Associates' defaults under the Whirlpool-Townsend Hotel Corporation/Townsend Associates Loan Documents. Rather, they argue against entry of summary judgment in favor of Whirlpool on the basis of three affirmative defenses.

First, the Browns argue, on procedural grounds, that Whirlpool's Cross-Claim fails to state a claim upon which relief can be granted because Whirlpool did not attach to its Complaint the original Guaranty executed by the Browns in December 1988. (The

---

**3.** In the alternative, Whirlpool argues that, if the Court finds Section 1823(e) applicable, it needs further discovery because it believes that RTC has not yet produced all of the evidence necessary to make the requisite factual determinations on the Section 1823(e) issue. Thus, Whirlpool contends that "the record is incomplete, such that genuine issues of material fact exist so as to

preclude the entry of summary judgment against Whirlpool at this juncture." [Whirlpool's Summary Judgment Motion, para. 10, p. 4.]

The Court notes that the Discovery Cut-Off in this case was July 30, 1993, and Whirlpool never sought any extension of that deadline. For this reason, the Court rejects Whirlpool's argument that more discovery is needed.

Guaranty upon which Whirlpool bases its Cross–Claim was executed in February 1991.)

Second, the Browns contend that Mrs. Brown should be found to have no liability on the Guaranty because they allege that Whirlpool's requiring her personal guaranty (in addition to her husband's) amounted to a violation of the Equal Credit Opportunity Act ("ECOA").

Lastly, in reliance on RTC's factual (and legal) summary judgment arguments regarding non-compliance with 12 U.S.C. § 1823(e) with respect to the Subordination Agreement (which purportedly would place First Federal (now RTC) *behind* Whirlpool in priority) the Browns argue that Whirlpool's alleged failure to insure that its first-priority interest was properly recorded in the Bank's records amounts to an impairment of collateral securing the Whirlpool/Townsend loan, and therefore, they should not be held liable on the Guaranty.[4]

The Court will address first, RTC's and Whirlpool's Cross–Motions on the Section 1823(e) issue, and then will address Whirlpool's Motion for Summary Judgment on its Cross–Claim against the Browns.

### III. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respon-

---

**4.** Whirlpool's motion actually addresses all nine of the Browns' "boilerplate" affirmative defenses. However, since the Browns' opposition to Whirlpool's motion is predicated only upon the three affirmative defenses of (1) failure to state a claim, (2) violation of ECOA, and (3) impairment of collateral, these are the only issues that need to be resolved by the Court.

**5.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure,* § 2727, at 33 (1993 Supp.).

dent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989).

The Court will decide the Whirlpool's and RTC's motions for summary judgment by application of the foregoing standards.

## B. *THE RTC'S AND WHIRLPOOL'S CROSS–MOTIONS FOR SUMMARY JUDGMENT*

■ Section 1823(e) of the Federal Deposit Insurance Act, 12 U.S.C. § 1823(e), provides as follows:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation [the FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

12 U.S.C. § 1823(e).

Although Section 1823(e) was originally made applicable only to the FDIC in its corporate capacity, that section was made applicable to the FDIC in its receivership capacity and the RTC on August 9, 1989 by the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA").[6]

Section 1823(e) has its origin in the U.S. Supreme Court's decision in *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In that case, a borrower gave a promissory note to a bank, but received no actual loan in return. A bank official and the borrower orally agreed that the bank would not enforce the note. When the bank failed, the FDIC acquired the note and attempted to enforce it. The borrower defended on the basis of lack of consideration. The Supreme Court held that the borrower could not raise this defense against the FDIC because this "secret" oral agreement was not part of the bank records. The Court held that as a matter of public policy, the FDIC must be able to rely on a bank's records to make quick, accurate evaluations of a bank's financial condition.

■ Throughout the years following *D'Oench, Duhme*, courts have substantially broadened the application of the holding of that case such that the *D'Oench* doctrine bars virtually any claim arising out of agreements not appearing in a contract the bank executed and maintained in its records. *See generally, Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co.*, 947 F.2d 196 (6th Cir.1991) and *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 799 F.Supp. 755, 773–774 (E.D.Mich.1992), and cases discussed therein.

With respect to the "codification" of *D'Oench* in 12 U.S.C. § 1823(e), the plain language of the statute requires more than just showing that an agreement has been maintained in the bank's records. The statute requires that the agreement

(1) be in writing;

(2) have been executed by the bank and the obligor contemporaneously with the bank's acquisition of the asset;

(3) have been approved by the bank's board of directors or its loan committee,

**6.** The FIRREA amendments abolished the Federal Savings and Loan Insurance Corporation ("FSLIC") and made the FDIC responsible for the duties previously handled by that agency. *See* 12 U.S.C. § 1821a(a)(5). The amendments also created the RTC, and granted the RTC "the same powers and rights to carry out its duties ... as the Federal Deposit Insurance Corporation [the FDIC] has under sections, 11, 12, and 13 of the Federal Deposit Insurance Act [12 U.S.C. §§ 1821, 1822 and 1823]...." 12 U.S.C. § 1441a(b)(4).

and this approval be reflected in the official minutes of the board or committee; and

(4) have been continuously from the time of its execution an official record of the bank.

The Supreme Court was called upon to interpret Section 1823(e) of the Federal Deposit Insurance Act in *Langley v. Federal Deposit Insurance Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). The Court noted that the scope of the statute's bar of claims or defenses against the FDIC covered more than the "secret" oral agreements contemplated by the *D'Oench* court. 484 U.S. 86, 90–92, 108 S.Ct. 396, 401.

In determining that strict compliance with all of the provisions of Section 1823(e) was required in order for a claim or defense against the FDIC predicated upon an alleged contract with a failed bank to survive, the *Langley* court carefully analyzed the purpose of the statute:

> One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, see 12 U.S.C. § 1817(a)(2), 1820(b), and when the FDIC is deciding whether to liquidate a failed bank, see § 1821(d), or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank, see §§ 1823(c)(2), (c)(4)(A). The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services. [Citation omitted.] Neither the FDIC nor the state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

> *A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee.* These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure. . . .

> \* \* \* \* \* \*

> The FDIC is an insurer of the bank, and is liable for the depositors' insured losses whether or not it decides to acquire the note. Cf. 12 U.S.C. § 1821(f). The harm to the FDIC caused by the failure to record [in the bank's records] occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available protective measures, including termination of the bank's deposit insurance. . . . Thus, insofar as the recording provision is concerned, the state of the FDIC's knowledge at that time is what is crucial. But as we discussed earlier ... § 1823(e) is meant to ensure more than just the FDIC's ability to rely on bank records at the time of an examination or acquisition. *The statutory requirements that an agreement be approved by the bank's board or loan committee and filed contemporaneously in the bank's records assure prudent consideration of the loan before it is made, and protect against collusive reconstruction of loan terms by bank officials and borrowers (whose interests may well coincide when a bank is about to fail) . . . .*

> *The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(a). An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew. It would be rewriting the statute to hold otherwise . . . .*

484 U.S. at 91–95, 108 S.Ct. at 401–403 (emphasis added).

In *Federal Deposit Insurance Corp. v. Gardner*, 606 F.Supp. 1484 (S.D.Miss.1985), the court applied the express requirements of Section 1823(e) and determined that the

defendants' defense to an action by the FDIC to collect on a promissory note was barred and therefore granted the FDIC's motion for summary judgment. In that case, the defendants argued that they were excused from payment by a written agreement executed by the President and Chairman of the Board of the bank. The agreement provided that the bank would release the Gardners' pledged security, forebear from collection on their promissory note, and would look only to a third party, Lawrence Staton, for payment on the note.

The FDIC moved for summary judgment against the defendants on the basis of 12 U.S.C. § 1823(e). Although the court found that requirements (1), (2) and arguably (4) of the statute were satisfied, because the minutes of the board of directors' meeting at which the promissory note was approved did not also reflect approval of the agreement to release the Gardners' security, forebear from collecting from them and to hold only Lawrence Staton liable for payment, the court determined that requirement (3) of Section 1823(e) was not met, and therefore, the agreement was not enforceable against the FDIC.

The strict compliance with the requirements of § 1823(e)(3) mandating that the official minutes of the depository institution's board of directors or its loan committee required by the *Gardner* court is in accord with the decisions of numerous other courts that have considered this precise issue. *See e.g., Federal Deposit Ins. Corp. v. Manatt,* 922 F.2d 486 (8th Cir.1991) (borrowers' agreement to relinquish collateral in exchange for cancellation of promissory notes representing borrowers' indebtedness to failed bank found not to be adequately reflected in the minutes of the bank's board of directors and therefore, held to be invalid against the FDIC pursuant to § 1823(e)); *Federal Deposit Ins. Corp. v. P.L.M. International, Inc.,* 834 F.2d 248 (1st Cir.1987) (agreement purportedly releasing borrowers from liability on their guaranties not reflected in board minutes and not included in official files of depository institution held to have no validity against the FDIC due to failure to satisfy all four

requirements of § 1823(e); *Federal Deposit Ins. Corp. v. Krause,* 904 F.2d 463, 466 (8th Cir.1990) ("the agreement failed to meet at least one of the requirements [of § 1823(e) ]—that approval by the board of directors or loan committee be reflected in the minutes of the board or committee", and therefore was held unenforceable as against the FDIC); *Federal Deposit Ins. Corp. v. Eagle Properties, Ltd.,* 664 F.Supp. 1027 (W.D.Tex.1985) (board of directors purported approval of certificate of subordination of vendor's lien not reflected in the board minutes and, hence, held to be unenforceable against FDIC); *F.D.I.C. v. Singh,* 977 F.2d 18 (1st Cir.1992) (Skinner, J. concurring) (record found to be devoid of evidence that board or loan committee approved an agreement purportedly releasing or modifying guarantors' liability, thus FDIC was entitled to summary judgment as a matter of law).

Turning to the subject subordination agreement which Whirlpool seeks to enforce in this case, there seems to be little question that the agreement was executed by Mark Baetens, a Vice–President of First Federal.[7] Thus, it is not in serious dispute that requirements (1) and (2) of § 1823(e) are satisfied. There is some dispute as to whether requirement (4)—that the agreement be an official bank record—is met. RTC asserts in its Brief that it reviewed First Federal's records before this lawsuit was initiated. A second review of the bank's records was done after Whirlpool filed its Counter–Claim with the subordination agreement attached. No copy of the agreement was located among any of the Townsend Hotel loan records. The agreement was eventually located in July 1993 in the loan file for Anthony Brown's mortgage on his home. However, the Court need not determine whether this is sufficient to satisfy the "official record" requirement of § 1823(e) because there is no dispute that there is no evidence to demonstrate that First Federal's Board of Directors or its Loan Committee even considered, let alone approved, the Whirlpool subordination agreement. There is no evidence whatsoever of any board or loan committee minutes, no contemporaneous records or notes reflecting

---

7. See footnote 2, *supra.*

such consideration, and no testimony from any witnesses indicated that either the Board of Directors or the pertinent loan committee considered this agreement.

██ Indeed, on April 15, 1993, in response to document production requests, RTC produced 30 different sets of meeting minutes for the Bank's Board of Directors and Senior Loan Committee, all of which referred to the loan transactions involving the Townsend Hotel. On July 1, 1993, RTC produced an additional 266 sets of meeting minutes, totalling over 5,000 pages. According to RTC, Whirlpool now has every set of minutes for every meeting of the Board of Directors and the Senior Loan Committee from January 1985 through December 1990, with the exception of the minutes of the board of directors from March 1989.[8] There is simply no reference to Whirlpool or the Bank's subordination of its interest to Whirlpool in any of those minutes.

Based upon the foregoing, the Court finds that the requirements of Section 1823(e) are not met with respect to the Whirlpool subordination agreement.

██ Whirlpool argues that the Court should find that Section 1823(e) does not apply to this case at all. In support of that argument, Whirlpool relies upon the Sixth Circuit's decision in *FDIC v. Aetna Casualty & Surety Co.*, *supra*.

As the Court discussed with counsel at length at oral argument, Whirlpool's reliance on the *Aetna* case is misplaced.

*Aetna* involved a banker's blanket bond issued to United American Bank ("UAB") in Knoxville, Tennessee before that bank failed.[9] When UAB failed, the FDIC was appointed its receiver. As receiver of the insured bank, the FDIC claimed entitlement to coverage and payment under the blanket bond. Aetna refused to make payment on the bond arguing that UAB officers had made fraudulent material and misrepresentations in UAB's bond application, and therefore, the bond was void *ab initio* as a matter of law.

The district court ruled that application of Section 1823(e) barred this defense. It held that to satisfy Section 1823(e)'s requirements, UAB's board of directors would have had to have effectively endorsed the representations made in the bond application in its minutes. The Court of Appeals disagreed and reversed the district court's determination, concluding that Section 1823(e) does not bar claims of fraud in the inducement.

In reaching its conclusion, the appellate court examined and applied the Supreme Court's decision in *Langley v. FDIC*, *supra*, and the policies underlying section 1823(e) highlighted by Justice Scalia in the Court's unanimous opinion:

> If Aetna were arguing that, although the bond stated that the limit for employee dishonesty was $5,000,000, the real limit, which was orally agreed to by the bank, was only $1,000,000, then the concerns that gave rise to the equitable estoppel doctrine of *D'Oench* and the subsequent enactment of section 1823(e) would be triggered. But Aetna is not making such an argument.
>
> \* \* \* \* \* \*
>
> In *Langley*, the Supreme Court stated that section 1823(e) would not apply to a contract that was void but would to a contract that was merely *voidable*. This is because a voidable title qualifies as a title or interest within the meaning of section 1823(e). Thus, the characterization of an "asset" as either void or voidable has significant ram-

---

8. The March 1989 Senior Loan Committee minutes, however, were produced. Mr. Baetens testified in his deposition that it would have been the Senior Loan Committee that would have considered and approved the Subordination Agreement and that that consideration and approval would have had to have occurred *prior* to his December 1988 execution of the Agreement. According to Mr. Baetens, since most of the members of the board of directors were also on the Senior Loan Committee, the board's approval with respect to agreements such as this one was merely to approve the *minutes* of the Senior Loan Committee meetings. Based on this evidence, the Court does not find the absence of the board of directors minutes for March 1989 to be material.

9. Tennessee state banks are required under that state's law to purchase bankers blanket bonds to provide insurance coverage for losses resulting from employee dishonesty, such as theft and fraud.

ifications. The following excerpt of the Restatement (Second) of Contracts describes a void contract: "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." Restatement (Second) of Contracts § 163 (1979). Put simply, no contract is formed under these circumstances because the terms of the contract were never assented to by one of the parties. This situation is commonly called fraud in the factum or fraud in the essence—or, as the Supreme Court stated, it is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents."

In contrast, a contract is void*able* "where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to avoid the power of avoidance." Restatement (Second) of Contracts § 7 (1979). . . .

Although the distinctions between void and voidable contracts exist across all contractual contexts, the difference between a void contract and one which is voidable is particularly significant with regard to negotiable instruments. A holder in due course holds a negotiable instrument free from "all defenses of any party to the instrument with whom the hold has not dealt except . . . (c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms. . . ." U.C.C. § 3–305(2). . . .

\* \* \* \* \* \*

It is against this backdrop that the *Langley* Court noted that fraud in the factum, citing the Uniform Commercial Code's holder in due course provision,

"would take the instrument out of § 1823(e), because it would render the instrument entirely void. . . ."

Consistent with the law of negotiable instruments and, more specifically, the holder in due course provision of the U.C.C., the *Langley* Court held that "[t]he bank therefore had and could transfer to the FDIC voidable title, which is enough to constitute 'title or interest' in the note. . . . If voidable title were not an 'interest' under § 1823(e), the FDIC would be subject not only to undisclosed fraud defenses but also to a wide range of other undisclosed defenses that make a contract voidable, such as certain kinds of mistakes and innocent but material misrepresentations.

947 F.2d at 202–205 (citations omitted).

Applying the foregoing analysis, the Sixth Circuit concluded that, because Aetna's defense was that the bank's material misrepresentations in the bankers bond application rendered the contract void (as opposed to voidable), Section 1823(e) was not triggered.

In the instant case, however, Whirlpool admits that it is not asserting fraud in the inducement and the record is devoid of any evidence to show that any of First Federal's officers engaged in fraudulent conduct to induce Whirlpool to agree to defer enforcement of its rights under the loan agreements. In the absence of any outright fraud to induce Whirlpool to defer, the Court finds that Section 1823(e) applies.

The Whirlpool Defendants further argue in opposing the RTC's Motion that because the scope of Section 1823(e), as it existed prior to the August 9, 1989 FIRREA amendments, did not extend to the RTC, it should not be applied "retroactively" to permit the RTC to rely on that section to invalidate agreements entered into prior to that date. In support of this position, Whirlpool cites only one 1990 Southern Texas Law Journal article,[10] and no case law, whatsoever.[11]

10. Gray, *Limitation on the FDIC's D'Oench Duhme Doctrine of Federal Common Law Estoppel; Congressional Preemption and Authoritative Statutory Construction.* 31 S.Tex.L.J. 245 (1990).

11. Whirlpool also cites an excerpt of colloquy reported in the July 20, 1950 Congressional Record which Whirlpool attempts to represent as "legislative history" of the *August 1989 FIRREA amendments.* The cited Congressional Record

This is not surprising since virtually *every* court to have considered the "retroactive application" issue has found that retroactive application of the FIRREA amendments with respect to Section 1823(e) is called for. *See, Resolution Trust Corp. v. Camp,* 965 F.2d 25, 31 (5th Cir.1992); *Federal Deposit Ins. Corp. v. Wright,* 942 F.2d 1089, 1095–97 (7th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992); *Federal Deposit Ins. Corp. v. Kasal,* 913 F.2d 487, 493 (8th Cir.1990), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991). *See also, Muller v. Resolution Trust Corp.,* 148 B.R. 650, 656–658 (S.D.Ga.1992); *Federal Deposit Ins. Corp. v. Engel,* 746 F.Supp. 1223 (S.D.N.Y.1990); *Resolution Trust Corp. v. Dismuke,* 746 F.Supp. 104 (N.D.Ga.1990); *Federal Deposit Ins. Corp. v. British–American Corp.,* 744 F.Supp. 116 (E.D.N.C.1990); *Federal Deposit Ins. Corp. v. Sullivan,* 744 F.Supp. 239 (D.Colo.1990); *Queen v. First Service Bank for Savings,* 129 B.R. 5, 10 (Bkrtcy.D.N.H.1991).

In determining that retroactive application of Section 1823(e) was called for, these courts applied the standard set out by the United States Supreme Court in *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), that the statute *at the time of the decision* should be applied unless there is express statutory direction or legislative history stating otherwise, or manifest injustice results. 416 U.S. at 710–712, 94 S.Ct. at 2016.

The Seventh Circuit in *Wright, supra* examined the legislative history of the 1989 amendments and concluded that amended § 1823(e) was "designed to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." 942 F.2d at 1096, *citing* H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 330, reprinted in 1989 U.S.Code Cong. & Admin.News 86, 126. However, the *Wright* court noted that despite this mandate, there was nothing in the floor debates nor the committee reports on FIRREA to indicate whether amended § 1823(e) should be applied only prospectively. *Id.* at 1095. None-

theless, the Seventh Circuit concluded, "In light of the increasing bank failures in the United States, a reasonable interpretation of § 1823(e) is that Congress included those provisions to aid the FDIC in its mounting responsibilities [and, thus] a retroactive application of § 1823(e) would further this Congressional intent. *Id.*

 Even if the legislative history does not support retroactive application of § 1823(e), *Bradley* permits retroactive application unless "manifest injustice" results. Manifest injustice requires consideration of the nature and identity of the parties, the nature of their rights, and the nature of the impact of the change in law upon those rights. *Bradley, supra,* 416 U.S. at 716–718, 94 S.Ct. at 2019.

In *Muller v. Resolution Trust Corp., supra,* the court determined that the nature of the parties supported retroactive application of Section 1823(e), reasoning as follows:

> [I]n mere private cases between individuals, a court will and ought to struggle hard against a construction which will be a retrospective operation [and] affect the rights of parties, *but in great national concerns ... the court must decide according to existing laws.* [Citations omitted.] Circumstances leading to the enactment of FIRREA involved matters of great national concern: Treasury Secretary Nicholas Brady characterized the situation as "the savings and loan crisis." while President Bush remarked that it was a "national problem." [Citations omitted.] *The presence of a great national concern counsels retroactive application of § 1823(e).*

148 B.R. at 657–658 (emphasis added.)

The *Muller* court further found no "manifest injustice" because § 1823(e) simply codified well-established common law announced by the Supreme Court in 1942 in *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and the *D'Oench* doctrine had, long before 1989 been expanded to cover the FDIC as receiver, and the FSLIC, just as the 1989 FIRREA amendments did with re-

---

excerpt, however, clearly refers not to the FIRREA amendments which expanded the scope of Section 1823(e), but rather to the original enactment of Section 1823(e) in 1950.

spect to Section 1823(e). *Muller*, 148 B.R. at 656. *See also, Taylor Trust v. Security Trust Fed. Savings & Loan Ass'n, Inc.*, 844 F.2d 337, 342 (6th Cir.1988) (finding no reason to treat different regulatory authorities differently and holding that *D'Oench* and its progeny protect both the FDIC and the FSLIC); *Federal Savings and Loan Ins. Corp. v. Murray*, 853 F.2d 1251, 1254 (5th Cir.1988) (agreeing with the Sixth Circuit).[12]

 For all of these reasons the Court finds that retroactive application of Section 1823(e) in this case is appropriate,[13] and therefore, the Court will GRANT the RTC's Motion for Summary Judgment on Whirlpool's Counter–Claim and will DENY Whirlpool's Cross–Motion for Summary Judgment. Accordingly, Whirlpool's Coun-

ter–Claim Against the RTC will be DISMISSED.

### C. WHIRLPOOL'S MOTION FOR SUMMARY JUDGMENT ON THE BROWNS' CROSS–CLAIM

As indicated above, Whirlpool has also moved for summary judgment in its favor on its Cross–Claim against Defendants Anthony and Sharon Brown. Whirlpool's Cross–Claim against the Browns is predicated upon their personal Guaranty of a $1.6 million loan made by Whirlpool to the Townsend Hotel Corporation.

The Browns do not deny their execution of the Guaranty, nor do they deny the Townsend Hotel Corporation/Townsend Associates' defaults under the Whirlpool–Townsend

---

**12.** Retroactive application of statutes has recently received a great deal of attention in the context of the 1991 Civil Rights Act. Our Circuit Court, noting the apparent conflict between *Bradley v. Richmond School Board, supra*, which sanctions retroactive application of a statute, and *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), which does not, held that *Bradley* "should not be applied in contexts where 'substantive rights and liabilities', broadly construed, would be affected [by retroactive application of a new law.]" *Harvis v. Roadway Exp., Inc.*, 973 F.2d 490, 496–497 (6th Cir.1992), *cert. granted, in part, sub nom Landgraf v. USI Film Products*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993).

The FIRREA amendments at issue in this case did not change Whirlpool's substantive rights under Section 1823(e)—the substantive law regarding the requirements of Section 1823(e) remained precisely the same as it was before the amendments. All that effectively was accomplished by the amendments was that the FDIC stepped into the shoes of the FSLIC, and the RTC was created to assist the FDIC in the performance of its duties. Under these circumstances, and in accordance with the Sixth Circuit's ruling in *Harvis*, application of the *Bradley* rule regarding retroactivity in this case is appropriate.

**13.** Whirlpool also argues in one brief paragraph that to permit the RTC to invalidate the Subordination Agreement through retroactive application of FIRREA would constitute an unconstitutional taking of private property (the Whirlpool collateral) for public use in violation of the Fifth Amendment. [See pp. 11–12 of Whirlpool's Response Brief.] In support of this argument, Whirlpool cites only one case dealing with retroactive application of *the Bankruptcy Reform Act of 1978*, and not a single case involving Section 1823(e). This is not surprising because every court dealing with Section 1823(e) and the Fifth

Amendment taking issue has held that no unconstitutional taking occurs by retroactive application of the statute. *See North Arkansas Medical Center v. Barrett*, 962 F.2d 780, 789–790 (8th Cir.1992); *Federal Savings & Loan Ins. Corp. v. Griffin*, 935 F.2d 691 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992); *Muller v. Resolution Trust Corp.*, 148 B.R. 650, 658, 659 (S.D.Ga.1992).

The Court further sees no merit in Whirlpool's argument that the FIRREA amendments should be analogized to the Bankruptcy Reform Act of 1978 because, while the Bankruptcy Reform Act changed legal ownership rights, as discussed *supra* in footnote 10, the FIRREA amendments did not change Whirlpool's substantive rights—the substantive law regarding the requirements of Section 1823(e) remained precisely the same as it was before the amendments. All that effectively was accomplished by the amendments was that the FDIC stepped into the shoes of the FSLIC, and the RTC was created to assist the FDIC in the performance of its duties. *See* footnote 5, *supra*.

Lastly, Whirlpool argues that Section 1823(e) should not be deemed applicable and the Court should instead should apply only state law regarding commercial transactions. In support of this argument, Whirlpool cites only one *unpublished* 1986 decision of the District Court for Nebraska. *See* pp. 13–16 of Whirlpool's Brief. By relying on this single unpublished decision, Whirlpool would have the Court ignore the clear controlling authority that *federal law* applies in determining the parties' rights and obligations under Section 1823(e). *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Federal Deposit Ins. Corp. v. Wood*, 758 F.2d 156 (6th Cir.1985), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985); *Muller v. Resolution Trust Corp., supra.*

Hotel Corporation/Townsend Associates Loan Documents. Thus, only the legal issues raised by the Browns in defense of Whirlpool's claim on the Guaranty need to be resolved. The Browns argue against entry of summary judgment in favor of Whirlpool on the basis of three affirmative defenses.

■ First, the Browns argue, on procedural grounds, that Whirlpool's Cross–Claim fails to state a claim upon which relief can be granted simply because Whirlpool did not attach to its Cross–Claim the original Guaranty executed by the Browns on December 2, 1988. However, the Guaranty upon which Whirlpool bases its Cross–Claim was executed in February 1991. Moreover, the last sentence of February 1991 Guaranty expressly states *"This Guaranty replaces the Guaranty dated December 2, 1988 executed by the undersigned to Whirlpool Leasing Services, Inc.* (which has since been merged into WFC [Whirlpool Financial Corporation])." [February 18, 1991 Guaranty, Whirlpool's Brief in Support, Ex. E. p. 3.] *See also,* January 16, 1991 Contingent Deferral and Additional Security Agreement ("CDASA"), Section II, para. 9 [Whirlpool's Ex. D, p. 5]:

> The Guarantors [the Browns] agree, contemporaneously with the execution of this Agreement and as a condition of WFC's willingness to enter into this Agreement, that they will execute and deliver a Guaranty to WFC in the form attached hereto. *It is understood and agreed that this Guaranty shall, upon delivery to WFC, supersede and replace their Guaranty dated December 2, 1988, as part of the Loan Documents.*

The clear language of the February 1991 Guaranty and the CDASA demonstrates that the December 8, 1988 Guaranty was no longer of any effect once the February 18, 1991 Guaranty was executed. Thus, the Browns "failure to state a claim" defense predicated upon Whirlpool's failure to attach a copy of the December 1988 Guaranty to its Cross–Claim has no legal merit.

■ Second, the Browns contend that Mrs. Brown should be found to have no liability on the Guaranty because, in their opinion, Whirlpool's requiring her personal guaranty (in addition to her husband's) amounted to a violation of the Equal Credit Opportunity Act ("ECOA").

■ The Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.,* was enacted, in large part, to eliminate credit discrimination against married women, who traditionally had been required to obtain their husbands' joinder to any credit applications. *See* 15 U.S.C. § 1691d(a); *United States v. ITT Consumer Finance Corp.,* 816 F.2d 487, 489 (9th Cir.1987). Among the regulations promulgated under ECOA is the following:

> (d) *Signature of spouse or other person— (1) Rule for qualified applicant.* Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant on any credit instrument *if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of credit requested.*

12 C.F.R. § 202.7(d)(1).

■ In making its determination of creditworthiness, a creditor is permitted to apply its own criteria, so long as they are "valid and reasonable criteria", and so long as they are nondiscriminating with regard to the applicant's marital status. *Anderson v. United Finance Co.,* 666 F.2d 1274 (9th Cir.1982); *Haynes v. Bank of Wedowee,* 634 F.2d 266, 270 (5th Cir.1981).

According to the Affidavit of Anthony J. Pope, the Vice–President of Asset Management of Whirlpool Financial Corporation, Following the Townsend Hotel's default under the original loan documents for the $1,646,234.09 loan from Whirlpool, and pursuant to the negotiations between the parties as the terms under which Whirlpool would forebear in enforcing its rights against the Townsend Hotel and the Guarantors, Whirlpool discovered that the Hotel was operating at a significant loss, and that it had no additional collateral to offer to Whirlpool in exchange for its forbearance. Thus, Whirlpool determined that it would need the personal guaranty of a creditworthy party in order to enter into the CDASA. [Pope Affidavit, para. 13, 14.]

Thereafter, the Townsend Hotel sent to Whirlpool a document entitled "Anthony S. and Sharon R. Brown Compilation of Statement of Financial Condition as of June 30, 1990." [Browns' Response, Ex. D.] Based upon Whirlpool's review of this Financial Statement and pursuant to Whirlpool's credit review standards, Whirlpool concluded that the Browns jointly owned the assets listed on the Statement. [Pope Affidavit, para. 12.] This review led Whirlpool to conclude that Mr. Brown was not creditworthy because he did not separately own sufficient assets, and because the assets were those jointly held with his wife, Sharon, it determined that the Browns, together, would have to execute the Guaranty. [Pope Affidavit, para. 15–16.]

■ The Browns do not dispute what Mr. Pope states with respect to the credit determination made with respect to the Browns' Financial statement. However, they claim that the determination of Mr. Brown's independent "uncreditworthiness" was wrong. Nonetheless, they have not come forward with any evidence to show that this determination was purely a pretext to discriminate based upon marital status.[14] Thus, their defense based upon violation of ECOA must fail as a matter of law.[15]

■ Lastly, in reliance on RTC's factual (and legal) summary judgment arguments regarding non-compliance with 12 U.S.C. § 1823(e) with respect to the Subordination Agreement (which would have placed First Federal (now RTC) *behind* Whirlpool in priority) the Browns argue that Whirlpool's alleged failure to insure that the Subordination Agreement was properly recorded in the Bank's records amounts to an impairment of the collateral securing the Whirlpool/Townsend loan. They essentially contend that had Whirlpool ensured that the Subordination Agreement was properly recorded in the

bank records, Whirlpool would have had a first-priority interest in the Collateral and it would have then been able to have foreclosed on that Collateral before coming after them on the Guaranty.

To accept the Browns' contention on this issue would require the Court to ignore the express language of the Guaranty providing that Whirlpool had absolutely no obligation to pursue its other rights and remedies before it proceeded against the Guarantors for full payment of the amount due under the Loan Documents. The Guaranty provided, in pertinent part, as follows:

> This is a continuing Guaranty and the obligation of the undersigned is a primary, absolute and unconditional obligation. Should any indebtedness not be paid at maturity (including accelerated or extended maturity) WFC shall have the right to proceed against the undersigned or any of them therefor at any time without any notice whatsoever and without any proceeding or action against Debtor, *the undersigned hereby waiving* presentment, demand, protest, notice of dishonor, right of subrogation and *any right* to require WFC to prosecute or seek to enforce any remedies against Debtor or any other party liable to WFC on account of the indebtedness and/or *to require WFC to seek to enforce or resort to any remedies with respect to any security interests, liens or encumbrances granted to WFC by Debtor or any other party on account of indebtedness.*

[Guaranty, Whirlpool's Ex. E, p. 2.]

Given this clear language, there is no basis for excusing the Browns from their Guaranty obligation simply because Whirlpool did not have a protected first-priority security interest in the Collateral. Whirlpool simply was

---

**14.** The burden of proof in an ECOA case is similar to that in any other type of discrimination case—if the claimant makes out a *prima facie* case by showing that that party is a member of a protected class, the burden shifts to the creditor to establish a non-discriminatory basis for its actions. *See In re DiPietro*, 135 B.R. 773, 776 (Bkrtcy.E.D.Pa.1992), and cases cited therein.

**15.** Whirlpool also raises in its Reply Brief two additional arguments as to why the Browns

ECOA defense should fail—the statute of limitations and the barring of using ECOA as an affirmative defense. However, it is well-settled that a party may not raise new issues for the first time in a reply brief; he can only respond to arguments raised for the first time in the respondent's response brief. *See United States v. Jerkins*, 871 F.2d 598 (6th Cir.1989). *See also*, 16C Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3974.

not, and is not, obligated to foreclose on the Collateral before proceeding against the Browns on their Guaranty.

Based upon the foregoing discussion, the Court finds that summary judgment on Whirlpool's Cross–Claim Against Anthony S. Brown and Sharon R. Brown should be GRANTED in favor of Whirlpool.

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Resolution Trust Corporation's Motion for Summary Judgment on Whirlpool's Counter–Claim be, and hereby is, GRANTED, and Whirlpool's Cross–Motion for Summary Judgment in its own favor on the Counter–Claim is hereby DENIED. Accordingly, Whirlpool's Counter–Claim against the RTC is hereby DISMISSED.

IT IS FURTHER ORDERED that Whirlpool's Motion for Summary Judgment on its Cross–Claim against Anthony S. Brown and Sharon R. Brown be, and hereby, is GRANTED.